322 P.3d 228

**Lloyd Y. ASATO, Petitioner/Plaintiff–Appellee/Cross–Appellant,**

v.

**PROCUREMENT POLICY BOARD,
State of Hawai'i, Respondent/Defendant–Appellant/Cross–Appellee.**

No. SCAP–12–0000789.

Supreme Court of Hawai'i.

Feb. 14, 2014.

Arthur Y. Park and John C. McLaren, Honolulu, for petitioner.

Marissa H.I. Luning, for respondent.

ACOBA, McKENNA, and POLLACK, JJ.; with RECKTENWALD, C.J., Dissenting, with whom NAKAYAMA, J., Joins.

Opinion of the Court by ACOBA, J.

We hold that Petitioner/Plaintiff–Appellee/Cross–Appellant Lloyd Y. Asato (Asato) had standing to bring a claim challenging the validity of Hawai'i Administrative Rule (HAR) § 3–122–66 (2008), based on his status as an "interested person" pursuant to Hawai'i Revised Statutes (HRS) § 91–7 (1993)[1], and in order to satisfy the "needs of justice." *See Life of the Land v. Land Use Comm'n.,* 63 Haw. 166, 176, 623 P.2d 431, 441 (1981). We also decide that HAR § 3–122–66 (2003)[2] is invalid because it exceeds the scope of authority given by the legislature to Respondent/Defendant–Appellee/Cross–Appellee State of Hawai'i Procurement Policy Board (the Board). *See* HRS § 91–7(b) ("The court shall declare the rule invalid if it finds that it ... exceeds the statutory authority of the agency[.]"). Finally, the court did not err in declining to invalidate all contracts issued under HAR § 3–122–66, as requested by Asato.

## I.

### A.

On January 25, 2011, Asato filed a Complaint asserting two causes of action, one for declaratory relief (declaratory action) and one for injunctive relief (injunctive action). In his Complaint, Asato maintained that he brought the Complaint pursuant to HRS § 91–7 and that he "also had the necessary standing to prosecute this action under *Federal Electric Corp. v. Fasi* [ (*Federal Electric* ) ], 56 Haw. 57, 62, 527 P.2d 1284, 1289 (1974) and *Iuli v. Fasi* [ (*Iuli* ) ], 62 Haw. 180, 186, 613 P.2d 653, 657 (1980)" as a taxpayer.

The Complaint asserted that HAR § 3–122–66[3] "is and has always been contrary to

---

1. HRS § 91–7 provides as follows:

 § 91–7. Declaratory judgment on validity of rules. (a) <u>Any interested person may obtain a judicial declaration as to the validity of an agency rule</u> as provided in subsection (b) herein by bringing an action against the agency in the circuit court of the county in which petitioner resides or has its principal place of business. <u>The action may be maintained whether or not petitioner has first requested the agency to pass upon the validity of the rule in question.</u>
 (b) The court shall declare the rule invalid if it finds that it violates constitutional or statutory provisions, <u>or exceeds the statutory authority of the agency,</u> or was adopted without compliance with the statutory rulemaking procedures.

2. The full text of HAR § 3–122–66 is set forth *infra.*

3. HAR § 3–122–66 provides in relevant part as follows:

 § 3–122–66 Waiver to Requirement for Procurement of Professional Services.
 (a) <u>If the names of less than three qualified persons are submitted pursuant to section 103D–304(g), HRS, the head of the purchasing agency may determine that:</u>
 (1) <u>Negotiations under section 103D–304(h), HRS, may be conducted provided that:</u>
 (A) <u>The prices submitted are fair and reasonable; and</u>
 (B) <u>Other prospective offerors had reasonable opportunity to respond; or there is not ade-</u>

(Emphases added.)

the 'minimum of three persons' requirement [in] HRS § 103D–304(g) [4] and is therefore invalid, and must be declared *void ab initio* and permanently enjoined from all further use." Further, the Complaint alleged that "[a]ccording to internet listings of contract awards on the State Procurement Office website[,] ... the previous City and County of Honolulu Administration has awarded at least twenty six (26) professional service con-

quate time to resolicit through public notice statements of qualifications and expressions of interest;

(2) The offers may be rejected pursuant to subchapter 11 and new statements of qualifications and expressions of interest may be solicited if the conditions in paragraph (1)(A) and (B) are not met;

(3) The proposed procurement may be cancelled; or

(4) An alternative procurement method may be conducted to include but not be limited to direct negotiations with other potential offerors if the head of the purchasing agency determines in writing that the need for the service continues, but that either the price of the offers received are not fair and reasonable or that the qualifications of the offerors are not adequate to meet the procurement needs, and there is no time for resolicitation, or resolicitation would likely be futile.

(Emphases added.)

4. HRS § 103D–304 (Supp.2010) provides in relevant part as follows:

**§ 103D–304 Procurement of professional services**

(a) Professional services shall be procured in accordance with sections 103D–302, 103D–303, 103D–305, 103D–306, or 103D–307, or this section; provided that design professional services furnished by licensees under chapter 464 shall be procured pursuant to this section or section 103D–307. Contracts for professional services shall be awarded on the basis of demonstrated competence and qualification for the type of services required, and at fair and reasonable prices.

(b) At a minimum, before the beginning of each fiscal year, the head of each purchasing agency shall publish a notice inviting persons engaged in providing professional services which the agency anticipates needing in the next fiscal year, to submit current statements of qualifications and expressions of interest to the agency....

(c) The head of the purchasing agency shall designate a review committee consisting of a minimum of three persons with sufficient education, training, and licenses or credentials for each type of professional service which may be required....

The committee shall review and evaluate all submissions and other pertinent information, including references and reports, and prepare a list of qualified persons to provide these services....

(d) Whenever during the course of the fiscal year the agency needs a particular professional service, the head of the purchasing agency shall designate a selection committee to evaluate the statements of qualification and performance data of those persons on the list prepared pursuant to subsection (c) along with any other pertinent information, including references and reports. The selection committee shall be comprised of a minimum of three persons with sufficient education, training, and licenses or credentials in the area of the services required....

(e) The selection criteria employed in descending order of importance shall be:

(1) Experience and professional qualifications relevant to the project type;

(2) Past performance on projects of similar scope for public agencies or private industry, including corrective actions and other responses to notices of deficiencies;

(3) Capacity to accomplish the work in the required time; and

(4) Any additional criteria determined in writing by the selection committee to be relevant to the purchasing agency's needs or necessary and appropriate to ensure full, open, and fair competition for professional services contracts.

(f) The selection committee shall evaluate the submissions of persons on the list prepared pursuant to subsection (c) and any other pertinent information which may be available to the agency, against the selection criteria....

(g) The selection committee shall rank a minimum of three persons based on the selection criteria and send the ranking to the head of the purchasing agency....

(h) The head of the purchasing agency or designee shall negotiate a contract with the first ranked person, including a rate of compensation which is fair and reasonable, established in writing, and based upon the estimated value, scope, complexity, and nature of the services to be rendered. If a satisfactory contract cannot be negotiated with the first ranked person, negotiations with that person shall be formally terminated and negotiations with the second ranked person on the list shall commence. The contract file shall include documentation from the head of the purchasing agency, or designee, to support selection of other than the first ranked or next ranked person. Failing accord with the second ranked person, negotiations with the next ranked person on the list shall commence. If a contract at a fair and reasonable price cannot be negotiated, the selection committee may be asked to submit a minimum of three additional persons for the head of the purchasing agency to resume negotiations in the same manner provided in this subsection. Negotiations shall be conducted confidentially.

(Emphases added.)

tracts for architects and engineers or for other professionals with less than three (3) persons on the list submitted to the selection committee" and that "[a]ll contracts that have been issued based on HAR § 3–122–66 are void ab initio." Therefore, Asato's declaratory action requested that "the court declare as a matter of law that HAR § 3–122–66 has never been valid and has always been ultra vires because it is contrary to and violates the "minimum of three persons requirement in HRS § 103D–304(g)[.]"

Correlatively, Asato's injunctive action requested that "all existing contracts in which HAR § 3–122–66 was used in violation of the 'minimum of three persons' requirement in HRS § 103D–304(g) be rescinded as being void ab initio." Asato also asked that "a preliminary injunction, and after hearing, a permanent injunction be entered enjoining and restraining [the Board] and all its agents, servants, and employees, and all others acting in concert with them, including but not limited to the administrator of the State Procurement Office, and all of his agents, servants[,] and employees, and all chief procurement officers and their agents, servants and employees in the state and county governments from utilizing HAR § 3–122–66 in the procurement of professional services under HRS § 103D–304."

On January 10, 2012, Asato filed a motion for summary judgment. Asato again contended that "HAR § 3–122–66 conflicts with HRS § 103D–304(g) and should be struck down[.]" Again, Asato asked the court to "declare that HAR § 3–122–66 has never been valid and has always been ultra vires and is void ab initio, enjoin its current and future use and declare that every government contract issued under the invalid authority of HAR § 3–122–66 is void ab initio."

On March 30, 2012, the Board filed a cross-motion for summary judgment. The Board argued that HAR § 3–122–66 was authorized by HRS § 103D–102(b)(4)(L),[5] and therefore "HAR § 3–122–66 is a valid rule." According to the Board, Asato did not have standing as a taxpayer because he did not demonstrate that he had suffered a pecuniary loss from the enactment of HAR § 3–122–66, and Asato did not have standing under HRS § 91–7 because "HRS § 91–7 limits relief to claims from 'interested persons' who can show an actual or threatened injury." (Citing *Richard v. Metcalf,* 82 Hawaiʻi 249, 253, 921 P.2d 169, 173 (1996).) Finally, the Board maintained that Asato could not challenge specific contracts awarded under HAR § 3–122–66 because "[c]hallenges to the award of procurement contracts are governed exclu-

---

5. HRS § 103D–102 (Supp.2010) provides in relevant part as follows

**§ 103D–102 Application of this chapter**
(b) Notwithstanding subsection (a), <u>this chapter shall not apply to contracts by governmental bodies:</u>
. . .
(4) <u>To procure the following goods or services which are available from multiple sources but for which procurement by competitive means is either not practicable or not advantageous to the State:</u>
(A) Services of expert witnesses for potential and actual litigation of legal matters involving the State, its agencies, and its officers and employees, including administrative quasi-judicial proceedings;
(B) Works of art for museum or public display;
(C) Research and reference materials including books, maps, periodicals, and pamphlets, which are published in print, video, audio, magnetic, or electronic form;
(D) Meats and foodstuffs for the Kalaupapa settlement;
(E) Opponents for athletic contests;
(F) Utility services whose rates or prices are fixed by regulatory processes or agencies;

(G) Performances, including entertainment, speeches, and cultural and artistic presentations;
(H) Goods and services for commercial resale by the State;
(I) Services of printers, rating agencies, support facilities, fiscal and paying agents, and registrars for the issuance and sale of the State's or counties' bonds;
(J) Services of attorneys employed or retained to advise, represent, or provide any other legal service to the State or any of its agencies, on matters arising under laws of another state or foreign country, or in an action brought in another state, federal, or foreign jurisdiction, when substantially all legal services are expected to be performed outside this State;
(K) Financing agreements under chapter 37D; and
(L) <u>Any other goods or services which the policy board determines by rules or the chief procurement officer determines in writing is available from multiple sources but for which procurement by competitive means is either not practicable or not advantageous to the State[.]</u>
(Emphases added.)

sively by the Procurement Code." (Citing HRS § 103D–704.)

### B.

On June 8, 2012, the circuit court of the first circuit (the court)[6] issued an order granting Asato's motion for summary judgment. As to Asato's standing, the court concluded that Asato was an "interested person" under HRS § 91–7 because he "seeks to obtain a judicial declaration," and "has brought an action against the agency in circuit court and is asking us to determine whether or not this rule is valid or invalid as it violates statutory provisions or exceeds statutory authority." The court also held that the "three-part test of injury in fact" set forth in *Bush v. Watson,* 81 Hawai'i 474, 918 P.2d 1130 (1996) "would have been met here."

The court explained that the first prong of the test was met because Asato demonstrated that the Board used HAR § 3–122–66 to "exempt certain procurements from requirements of HRS § 103D–304, where [Asato] assert[ed] that the administrative rule is inconsistent with the statute." The second prong was met "because the actual or threatened injury to [Asato], as a taxpayer, is directly traceable to [the Board's] actions, especially in concerning integrity of contracts using taxpayer funds." Finally, the third prong was met because "a favorable decision would require [the board] to follow the statutory mandates of HRS § 103D–304, and would result or render [sic] HAR § 3–122–66 invalid, which is the direct object of [Asato's] lawsuit."

As to the validity of HAR § 3–122–66, the court explained that "[HRS § ] 103D–102(b)(4) lists 11 very specific goods and services exempted from the ambit of 103D," and therefore "subsection (L) ... must be read by its plain and obvious meaning—which is that the policy board must determine by rule, or [the] chief procurement officer must determine in writing, specific

classes of goods or services which are available from multiple services, but for which procurement by competitive means is either not practicable nor advantageous to the State[;]" but "HAR § 3–122–66 does not do any such thing." Moreover, the court concluded that HAR § 3–122–66 could not be justified by the need to "fill a gap left in HRS § 103D–304," because "[t]he plain language of section 304 does not leave any such gaps[.]" Therefore, the court held that "that HAR § 3–122–66 is invalid[.]"

However, the court "declin[ed] to declare any contracts exempted under HAR § 3–122–66 void prior to the date that its order is filed," because "the plain reading of standing in HRS § 91–7 is that the court shall declare the rule invalid and that is all the court does."

Finally, the court ruled on Asato's request for attorney's fees pursuant to the private attorney general doctrine. It held that all three factors of the private attorney general doctrine, set forth *infra,* were met, and awarded Asato reasonable attorney's fees and costs.

### C.

On August 15, 2012, the court entered a judgment in favor of Asato and against the Board. Then, on September 4, 2012, the court issued its order awarding attorney's fees and costs.

### D.

Both Asato and the Board appealed the court's August 15, 2012 judgment. The Board also appealed the court's September 4, 2012 order awarding attorney's fees and costs. On June 27, 2013, Asato filed an application for transfer of the appeal from the Intermediate Court of Appeals (ICA) to this court. This court granted a discretionary transfer on August 1, 2013, pursuant to HRS § 602–58(b) (Supp.2012).[7] The parties had already filed briefs with the ICA.

---

6. The Honorable Karl K. Sakamoto presided.

7. HRS § 602–58(b) provides as follows:
 (b) the supreme court, in a manner and within the time provided by the rules of the court,

may grant an application to transfer any case within the jurisdiction of the intermediate appellate court to the supreme court upon the grounds that the case involves:

## II.

### A.

In its Opening Brief, the Board argued, *inter alia*, that (1) Asato did not have standing as a taxpayer because he failed to meet any of the three requirements for taxpayer standing set forth in *Iuli*, (2) the court erred in concluding that Asato had standing under HRS § 91–7 because Asato did not suffer injury in fact, and (3) that the court erred in concluding that HAR § 3–122–66 was invalid, because the Board was authorized to adopt HAR § 3–122–66 under HRS § 103D–102(b)(4)(L).

### B.

### 1.

Asato filed a cross-appeal, arguing *inter alia* that the court erred in refusing to grant his requested relief of (1) "declar[ing] as a matter of law that HAR § 3–122–66 has never been valid and has always been void ab initio[,]"[8] (2) "declar[ing] that every government contract issued under the invalid authority of HAR § 3–122–66 is void ab initio," and (3) "preliminarily and permanently enjoin[ing] and restrain[ing] the [Board] . . . from using HAR § 3–122–66."

### 2.

In its Answering Brief on cross-appeal, the Board asserted that "[a] declaration of invalidity is all that is required by HRS § 91–7," and therefore the court did not err in "refusing to also declare the Rule void ab initio or 'always . . . ultra vires.' " (Emphasis in original.) In the alternative, the Board contended that "even if Asato's position were correct," he was not entitled to the "voiding of all government contracts entered into pursuant to the Rule."

(1) A question of first impression or a novel legal question; or
(2) Issues upon which there is an inconsistency in the decisions of the intermediate appellate court or of the supreme court.

**8.** To reiterate, the court's order concluded that "HAR § 3–122–66 is invalid, pursuant to the statutory authority under HRS § 91–7." Asato

The Board explained that, first, "while HRS § 91–7 allows a circuit court to hear attacks on a rule's validity, it 'does not give the circuit court jurisdiction to hear a challenge to the application of a rule.' " (Quoting *Puana v. Sunn*, 69 Haw. 187, 189, 737 P.2d 867, 869 (1987).) (Emphasis in original.) Second, according to the Board, "voiding the contracts would clearly be improper because the parties to the contracts are not parties to this case," and "the 'absence of interested parties can be raised at any time even by a reviewing court on its own motion.' " (Quoting *Marvin v. Pflueger*, 127 Hawai'i 490, 503, 280 P.3d 88, 101 (2012).) (Emphasis in original.)

As to Asato's argument that he was entitled to an injunction, the Board asserted that Asato waived any argument that he was entitled to an injunction because Asato's Opening Brief did not "mention [ ] the standards required to obtain an injunction or [ ] attempt to argue that Asato met such standards." Additionally, the Board noted that Asato "did not even file a motion for a preliminary or permanent injunction." The Board explained that " '[a]n injunction is an extraordinary remedy' which is used when a problem cannot 'be adequately redressed by an action at law.' " (Quoting *Morgan v. Planning Dep't, County of Kauai*, 104 Hawai'i 173, 188, 86 P.3d 982, 997 (2004).) (Emphasis added.) Here, "[b]ecause the [court] declared that [HAR § 3–122–66] was invalid, an injunction would have been superfluous even if Asato had properly requested one."

### 3.

In his Reply Brief, Asato argued that "injunctive relief is an appropriate and necessary remedy to stop a government agency's statutory violation," and that "[n]o Hawai'i court has said an injunction is unnecessary to restrain a violation of a statute." Additional-

construes the court's order as ruling that "HAR § 3–122–66 was invalid as of the date of entry of its order." Asato does not explain why it was relevant that the court declined to rule that HAR § 3–122–66 "has never been valid;" however, this argument is apparently linked to his contention that the court should have invalidated each contract issued under HAR § 3–122–66.

ly, according to Asato, he had standing as a taxpayer to challenge the individual contracts issued under HAR § 3–122–66, in addition to his challenge based on HRS § 91–7. Also, Asato contended that the Board failed to raise the issue of absent indispensable parties before the court and that "the identification and disposition of affected government contracts could take place on remand or in a separate proceeding[.]" (Citing *Haiku Plantations Ass'n v. Lono*, 56 Haw. 96, 103, 529 P.2d 1, 6 (1974).) Finally, Asato maintained that the Board's indispensable parties argument also fails because "illegal, and hence, void, contracts are not enforceable against the government agency where the agency violated the procurement law or a public policy."

## III.

### A.

▅▅▅▅ Asato is entitled to standing in this case pursuant to HRS § 91–7.[9] *See Life of*

*the Land*, 63 Haw. at 176, 623 P.2d at 441. As related, Asato's action was brought pursuant to HRS § 91–7, which allows "[a]ny interested person" to obtain "a judicial declaration as to the validity of an agency rule." The court determined that Asato had standing under HRS § 91–7.[10] The analysis as to HRS § 91–7 in this opinion differs from that of the court, in that Asato is not required to satisfy the three-part injury in fact test in order to obtain standing as an "interested person".

### B.

This court has considered what is required to become "[a]ny interested person" under HRS § 91–7 in two prior cases. In *Life of the Land*, the plaintiffs challenged the legality of procedures followed by the Land Use Commission in boundary review. *Id.* at 177, 623 P.2d at 441. The Land Use Commission asserted that the plaintiffs had not demonstrated standing to seek judicial relief. *Id.* at 171, 623 P.2d at 437–38.

9. Inasmuch as we find standing based on HRS § 91–7, we need not reach the claims raised on taxpayer standing or HRS § 632–1. It is said, "[m]any states have liberalized taxpayer standing ... and allow taxpayer suits against any improper expenditure without need to show special injury to the plaintiff." *Akau v. Olohana Corp.*, 65 Haw. 383, 387, 652 P.2d 1130, 1133 (1982). The ability to challenge illegal public expenditures is "based upon ... the taxpayer's equitable ownership of such funds and his liability to replenish the public treasury for deficiencies caused by the misappropriation." *Hawai'i's Thousand Friends v. Anderson*, 70 Haw. 276, 282, 768 P.2d 1293, 1298 (1989) (internal quotation marks omitted). This court has recognized that in "special situations," such as where the State awards government contracts involving "patently improper and defective bidding procedures," a plaintiff does not need to demonstrate actual pecuniary harm because the harm to taxpayers "could be presumed." *Iuli*, 62 Haw. at 185–86, 613 P.2d at 657; *see also Federal Electric*, 56 Haw. at 62, 527 P.2d at 1290; *Mottl v. Miyahira*, 95 Hawai'i 381, 391 n. 13, 23 P.3d 716, 727 n. 13 (2001).

10. Although the court did not decide the taxpayer standing issue, it may be noted that the dissent contends that the "special situation" discussed in *Iuli* and *Federal Electric* is not presented here because (1) "HAR § 3–122–66[ ] is not an 'innovative procedure without the benefit of definitive guidelines,'" dissenting opinion at 366, 322 P.3d at 261 (quoting *Federal Electric*, 56 Haw. at 66, 527 P.2d at 1291), (2) unlike in the instant case,

in *Federal Electric*, the City awarded a contract to a bidder whose bid exceeded the plaintiff by more the $90,000, dissenting opinion at 366, 322 P.3d at 261, and (3) *Federal Electric* and *Iuli* were "decided at a time when there was no express provision allowing for a judicial action by disappointed bidders." Dissenting opinion at 367, 322 P.3d at 262.

Respectfully, the foregoing is incorrect. First, to reiterate, *Iuli* recognized that harm may be presumed in all cases involving "patently improper or defective bidding procedures," irrespective of whether those procedures were "innovative." *Iuli*, 62 Haw. at 185–86, 613 P.2d at 657. Second, *Federal Electric* did not rely on the fact that the plaintiff was the lowest bidder. The issue in *Federal Electric* was not that the plaintiff's bid was the lowest bid, but rather that due to indefinite specifications, it could not be determined whether the plaintiff was in fact the lowest bidder. *Federal Electric*, 56 Haw. at 62, 527 P.2d at 1289. Third, the lack of any express provision allowing for suit by a disappointed bidder was irrelevant inasmuch as the law granted disappointed bidders standing to sue irrespective of their standing as taxpayers. *Id.; see also, e.g., In re Air Terminal Servs.*, 47 Haw. 499, 510–12, 393 P.2d 60, 68 (1964) (holding that a disappointed bidder who was not a taxpayer had standing to argue that it had a "clear legal right to be awarded the contract"). Thus, the requirements imposed by the dissent on taxpayer standing in this area are inconsistent with our precedent.

In rejecting the Land Use Commission's argument, this court articulated the general principle that "we have not been inclined to foreclose challenges to administrative determinations through restrictive applications of standing requirements, and see no sound reason for doing so here." *Id.* at 171, 623 P.2d at 438. *Life of the Land* further took note of the "expansive trend in defining injury for standing purposes," as articulated in *In re Hawaiian Elec. Co.*, 56 Haw. 260, 535 P.2d 1102 (1975):

> "We note that the trend in American jurisprudence as evidenced by recent decisions of this court and courts across the land, has been to broaden the class of persons that have standing to challenge agency action. The United States Supreme Court has clearly indicated that standing cannot be confined only to those who allege economic harm, nor can it be denied to others simply because many persons share the same purported injury . . . ."

*Life of the Land*, 63 Haw. at 175, 623 P.2d at 440 (emphasis added) (quoting *In re Hawaiian Elec. Co.*, 56 Haw. at 265 n. 1, 535 P.2d at 1105 n. 1). This court further observed that " '[c]omplexities about standing are barriers to justice; in removing the barriers the emphasis should be on the needs of justice.' " *Id.* at 174 n. 8, 623 P.2d at 439 n. 8 (quoting *E. Diamond Head Ass'n v. Zoning Bd. of Appeals*, 52 Haw. 518, 523 n. 5, 479 P.2d 796, 799 n. 5 (1971)). "Our touchstone[,]" *Life of the Land* concluded, therefore "remains 'the needs of justice.' " *Id.* at 176, 623 P.2d at 441.

Having articulated the standing doctrine thus, *Life of the Land* surmised that the plaintiff organization and its members had a " 'stake' in the outcome of the alleged controversy adequate to invoke judicial intervention, even though they [were] neither owners nor adjoining owners of land reclassified by the Land Use Commission. . . ." *Id.* at 177, 623 P.2d at 441. In applying HRS § 91–7, this court determined that because the plaintiffs had interests that "may have been adversely affected, they undoubtedly [were] 'interested persons[,]' " for purposes of HRS § 91–7.[11] *Id.* at 177–78, 623 P.2d at 441. It also noted that plaintiffs had been deemed "aggrieved persons" in a prior case and thus were undoubtedly "interested persons." *Id.* at 178, 623 P.2d at 441.

In *Richard*, this court seemingly adopted a more stringent standing requirement for "[a]ny interested person" than was necessarily required in *Life of the Land*. Instead of concluding simply that the plaintiffs had interests that "may have been adversely affected," *Life of the Land*, 63 Haw. at 177–78, 623 P.2d at 441, *Richard* required that the plaintiffs demonstrate an "injury in fact." *Richard*, 82 Hawai'i at 253–54, 921 P.2d at 173–74. However, it is not clear how *Richard* reached this conclusion. *Richard* states that it was relying on *Bush*, which, according to *Richard*, "applied the 'injury in fact' test to determine the standing of a party who had filed a declaratory judgment action under HRS § 91–7." *Richard*, 82 Hawai'i at 253, 921 P.2d at 173. However, *Bush* does not mention either HRS § 91–7 or "[a]ny interested person", or provide any analysis on why the injury in fact test should apply to "[a]ny interested person[s]." *See Bush*, 81 Hawai'i at 479, 918 P.2d at 1135.

Thus, it was not evident why "[a]ny interested person" must meet the injury in fact test under *Richard*, when, in *Life of the Land*, this court stated that a plaintiff who has interests that "<u>may</u> have been adversely

---

11. The dissent notes that this statement is "not at odds with the application of the injury in fact test." Dissenting opinion at 363, 322 P.3d at 258. Although not "at odds" with the injury in fact test, *Life of the Land* did not explicitly require that all three prongs of the injury in fact test be satisfied in its discussion of standing under HRS § 91–7. *See* 63 Haw. at 177–78, 623 P.2d at 441. The dissent further states that "nothing in *Life of the Land* suggests that a plaintiff need not demonstrate injury in fact in order to have standing under HRS § 91–7[,]" dissenting opinion at 363, 322 P.3d at 258, yet, nothing in *Life of the Land requires* that a plaintiff demonstrate injury in fact either. Indeed, were the criteria for "[a]ny interested person" the same as the injury in fact test for an "aggrieved" person, this court would have simply said so in *Life of the Land*, since the plaintiffs had already been designated as "aggrieved" persons, having met the injury in fact test. That the standing threshold for "interested person[s]" was not the same is manifested by that fact, and the extended discussion concerning "interested person[s]" in *Life of the Land*.

affected," is "[a]ny interested person." *Life of the Land,* 63 Haw. at 177–78, 623 P.2d at 441 (emphasis added). Accordingly, in the absence of supportive reasoning, it is difficult to accord governing impact to this aspect of *Richard,*[12] particularly where the plain language of HRS § 91–7 and the legislative history of that statute require a different result that is in accord with *Life of the Land.*

### C.

■ In the context of HRS § 91–7, "[a]ny" means "one selected without restriction." *Merriam Webster's Collegiate Dictionary* 53 (10th ed. 1993). "Interested" is defined as "being affected or involved[.]" *Id.* at 610. "Persons" is defined in HRS § 91–1 (1993) broadly as "individuals, partnerships, corporations, associations, or public or private organizations of any character other than agencies." Therefore, "[b]ased on the plain language of [HRS § 91–7], then, [any] interested person[ is one who is, without restriction] 'affected' by or 'involved'" with the validity of an agency rule. *AlohaCare v. Ito,* 126 Hawai'i 326, 360, 271 P.3d 621, 655 (2012) (Acoba, J., concurring and dissenting). This is consistent with the holding in *Life of the Land* that a plaintiff who has interests that "may have been adversely affected," is an "interested person."[13] 63 Haw. at 177–78, 623 P.2d at 441. Under the circumstances of this case, Asato qualifies as an "interested person" because, as a taxpayer challenging a specific public bidding procedure, he may be affected by the validity of a regulation that allegedly allowed an illegal

expenditure of public funds.[14] *See e.g., Hawai'i's Thousand Friends,* 70 Haw. at 282, 768 P.2d at 1298.

### D.

Furthermore, in adopting HRS § 91–7, the legislature deviated from the MSAPA with respect to who may be "[a]ny interested person." *See* Model State Administrative Procedure Act, 1961 Act (U.L.A.) § 7. The MSAPA section setting out a procedure for declaratory judgments as to the validity or applicability of rules provides, as its first sentence, that: "The validity or applicability of a rule may be determined in an action for declaratory judgment in the [court], <u>if it is alleged that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff.</u>" *Id.* (emphasis added). In contrast, the first sentence of HRS § 91–7(a) provides, to reiterate, that "<u>[a]ny interested person</u> may obtain a judicial declaration as to the validity of an agency rule...."

In explaining this departure from the MSAPA, the House Judiciary Committee stated that "[y]our Committee is of the opinion that this section will allow an interested person to seek judicial review on the validity of a rule for the reasons enumerated therein <u>regardless of whether there is an actual case or controversy.</u>" H. Stand. Comm. Rep. No. 8, in 1961 House Journal, at 658 (emphasis added). The three-part injury test serves as Hawai'i's counterpart to the Article III "cases and controversies" requirement. *See*

---

12. *Richard* is overruled to the extent that it may conflict with the decision herein.

13. The dissent argues that where the legislature has intended "any person" to be able to bring suit, it has used the term "any person". Dissenting opinion at 365, 322 P.3d at 260. *See, e.g.,* HRS § 91–12. However, Asato is not simply "[a]ny person", but a taxpayer who may be affected by the illegality of a bidding procedure. Also, by the same token, the term "[a]ny interested person" does not by its plain language require that an individual have met the injury in fact test.

14. The dissent states that "Asato made no showing that he was either personally 'affected' by or 'involved' with HAR § 3–122–66." Dissenting

opinion at 364, 322 P.3d at 259. However, Asato is affected as a taxpayer, in challenging the validity of a specific bidding procedure <u>in the procurement context.</u> In that specific situation, our taxpayer cases indicate harm may be presumed. *See* nn. 9 and 10, *supra.* By stating that the majority "fails to point to any allegation made by Asato that he was <u>personally</u> affected by or involved with HAR § 3–122–66[,]" dissenting opinion at 365, 322 P.3d at 260 (emphasis added), the dissent appears to be arguing that Asato could not meet the injury in fact test; however, we hold that that test does not apply for the reasons set forth *supra* and *infra.* For the same reasons, Asato's complaint was sufficient to withstand summary judgment. *See* dissenting opinion at 361 n. 2, 322 P.3d at 256 n. 2.

*Bush,* 81 Hawai'i at 479, 918 P.2d at 1135; *Life of the Land,* 63 Haw. at 172, 623 P.2d at 438. *See also Mottl,* 95 Hawai'i at 396, 23 P.3d at 731 (Acoba, J., concurring, joined by Ramil, J.) ("Our analogue of 'article III' jurisdictional requirements is the three-part injury test."). However, courts of this state are not bound by the U.S. Constitution's Article III, § 2 "cases or controversies" requirement. *See Life of the Land,* 63 Haw. at 171–72, 623 P.2d at 438.

Accordingly, where the legislative history of HRS § 91–7 indicates that no "actual case or controversy" is required, see 1961 House Journal, at 658, the legislature obviously intended to liberalize standing requirements.[15] As a result, this court should not mandate that the three-part injury test is necessary to bring an action pursuant to HRS § 91–7.

## E.

■ Moreover, it is well-established that the requirements to be "[a]ny interested person" are less than those to be an "aggrieved person" in HRS chapter 91.[16] *See Aloha-Care,* 126 Hawai'i at 344, 271 P.3d at 640; *Richard,* 82 Hawai'i at 253, 921 P.2d at 173; *Life of the Land,* 63 Haw. at 177–78, 623 P.2d at 441. Indeed, by using the term "[a]ny interested person" rather than "aggrieved [person]", the legislature established a "broader platform" for "persons" bringing actions under HRS § 91–7. *Cf. AlohaCare,* 126 Hawai'i at 362, 271 P.3d at 657 (Acoba, J., concurring and dissenting) (noting that in the context of HRS § 91–8 (1993), "[a]ny interested person" should be construed dif-

ferently from an HRS § 91–14 "aggrieved person").

■ Under our case law, an "aggrieved person" is one who has suffered an injury in fact, *see E & J Lounge Operating Co. v. Liquor Comm'n of City & Cnty. of Honolulu,* 118 Hawai'i 320, 346 n. 35, 189 P.3d 432, 458 n. 35 (2008), and therefore, the term "[a]ny interested person" is one who is subject to less stringent standing requirements. Based on the plain language of HRS § 91–7, the legislative history, and the differences between an "interested person" and a "person aggrieved" in Chapter 91, an "interested person" need not show injury in fact in order to bring an action pursuant to HRS § 91–7.

Also, our courts have "broadened standing in actions challenging administrative decisions[,]" *Mottl,* 95 Hawai'i at 391, 23 P.3d at 726, and "in cases of public interest under our jurisdiction[,]" *Bush,* 81 Hawai'i at 479, 918 P.2d at 1130. As was held in *Pele Defense Fund v. Paty,* 73 Haw. 578, 837 P.2d 1247 (1992), "[t]his court has adopted a broad view of what constitutes a 'personal stake' in cases in which the rights of the public might otherwise be denied hearing in a judicial form." 73 Haw. at 593, 837 P.2d at 1257 (citation and internal quotation marks omitted). *Life of the Land,* explained that "standing requirements should not be barriers to justice." 63 Haw. at 174, 623 P.2d 431. In this case, to deny Asato standing as an "interested person" would be to effectively erect a barrier to justice by preventing judicial review of the validity of HAR § 3–122–66.[17]

**15.** This is also evidenced by the language of HRS § 91–7(a), which states that "[t]he action may be maintained whether or not petitioner has first requested the agency to pass upon the validity of the rule in question."

**16.** HRS 91–14 (Supp.2004) uses the term "person aggrieved". That section provides for judicial review for "[a]ny person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief. . . ." HRS § 91–14(a).

**17.** The dissent states that we "impl[y] that standing under *Life of the Land* is so expansive that the

injury in fact requirement no longer applies under HRS § 91–7." Dissenting opinion at 363, 322 P.3d at 258. To the contrary, we simply articulate the principles in *Life of the Land* indicating what "[a]ny interested person" means under HRS § 91–7. Although the dissent would mandate the same injury in fact requirement, applicable to "aggrieved person[s]," in contested cases under HRS § 91–14 for "[a]ny interested person[s]" in claims brought under HRS § 91–7, it sets forth no reasons why the injury in fact test applied to aggrieved persons should be mandated for "[a]ny interested person" in the context of dissimilar actions and remedies under HRS § 91–7. *See State v. Fields,* 67 Haw. 268, 274, 686 P.2d 1379, 1385 (1984) (internal quotation marks and citation omitted).

One of the reasons stated for imposing the injury in fact requirement is to deny standing in cases where the litigant " 'seek[s] to do no more than vindicate [his or her] own value preferences through the judicial process[.]' " *Richard,* 82 Hawai'i at 253, 921 P.2d at 174 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Instead, the litigant here sought a declaratory judgment as to the validity of a regulation. This type of action cannot be said to be one that vindicates Asato's own value preferences through the judicial process, because if the regulation is indeed invalid, then the action brought by Asato will actually serve to uphold the legislature's intent in the government procurement area.

### F.

As noted, HAR § 3–122–66 allowed for the Board to, under certain circumstances, procure professional services where less than three potential qualified persons had been identified, HAR § 3–122–66(a), in contrast with HRS § 103D–304(g) which required that "[t]he selection committee shall rank a minimum of three persons based on the selection criteria and send the ranking to the head of the purchasing agency." In bringing an action to determine whether the promulgation of HAR § 3–122–66 exceeded the scope of the Board's authority outlined in the procurement code, Asato therefore sought to effectuate the purposes behind the procurement code, and accordingly, the public interest. *See CARL Corp. v. State, Dep't of Educ.,* 85 Hawai'i 431, 455, 946 P.2d 1, 25 (1997) (noting that "[i]t is certainly in the public interest that the [State] abide by the procurement rules it has set for itself").

 When the legislature enacted the current procurement code, HRS chapter 103D in

1993, it set out a number of intended purposes in the preamble to the act, among which were:

(4) Ensuring the fair and equitable treatment of all persons who deal with the procurement system of the State and counties;

(5) Providing increased economy in procurement activities and maximizing to the fullest extent practicable the purchasing value of public funds;

(6) Fostering effective broad-based competition within the free enterprise system;

(7) Providing safeguards for the maintenance of a procurement system of quality and integrity; and

(8) Increasing public confidence in the procedures followed in public procurement.

1993 Haw. 1st Special Sess. Laws Act 8, § 1 at 38–39. A challenge to the validity of a particular regulation as outside the scope of the procurement code protects the principles under which the HRS chapter 103D was enacted. Specifically, Asato's complaint contended that "[c]ontracts issued in circumvention of the 'minimum of three persons' requirement [in] HRS § 103D–304(g) violate ... the long established public policies ... including '[p]roviding increased economy in procurement activities and maximizing to the fullest extent practicable the purchasing value of public funds.' " (Quoting HRS § 103–304(g).) Inasmuch as Asato sought to sustain the objectives of the procurement code, his action was "a case of public interest," *Bush,* 81 Hawai'i at 479, 918 P.2d at 1130, and therefore relaxed standing requirements would apply.[18] Therefore, Asato has standing to challenge the validity of HAR § 3–122–66, under HRS § 91–7, as mandated by

---

18. Additionally, a determination that Asato has standing to challenge the regulation herein is consistent with the principle of separation of powers. It has been explained that "[w]ithout judicial review, there would be no 'check' on the propriety of the agency's actions under the law and the agency could be left to decide the legality of its own actions." *Alakai Na Keiki, Inc. v. Matayoshi,* 127 Hawai'i 263, 277, 277 P.3d 988, 1002 (2012) (citing *McHugh v. Santa Monica Rent Control Bd.,* 49 Cal.3d 348, 261 Cal.Rptr. 318, 777 P.2d 91, 107 (1989)). Consequently, "if

the legislature delegates judicial power to an administrative agency and precludes judicial review of the legality of the agency's own actions, a separation of powers issue would arise." *Id.* HRS § 91–7 allows for judicial review of the validity of agency rules. However, if judicially-imposed standing limitations preclude review of administrative rules, then the judiciary will be prevented from considering the legality of agency actions, in contravention of the doctrine of separation of powers.

"the needs of justice." *Life of the Land,* 63 Haw. at 176, 623 P.2d at 441.

G.

The dissent asserts that "until today, it has been well settled that a plaintiff must satisfy the three-part injury in order to have standing under HRS § 91–7[,]" dissenting opinion at 362, 322 P.3d at 257, and that we abandon long standing precedent in reaching a different conclusion. *Id.* Respectfully, based on the previous cases, the standing issue is squarely presented in this case and previously was not "well settled." In the discussion of standing in the context of HRS § 91–7, this court never actually applied the three-part injury in fact test in *Life of the Land* or indicated that it must be applied in order for a plaintiff to be an "interested person." 63 Haw. at 177–78, 623 P.2d at 441. While the plaintiffs in that case clearly would have satisfied the test, because they had already been deemed "aggrieved persons," this court did not require in *Life of the Land* that plaintiffs allege an injury in fact in order to achieve HRS § 91–7 standing. *Id.* In *Richard,* as noted, no reasoning was proffered as to why an "interested person" must meet the injury in fact test, despite the fact that it was the first case to articulate that requirement. 82 Hawai'i at 253–54, 921 P.2d at 173–74. Instead, *Richard* may have erroneously assumed that the issue had already been resolved in *Bush. Id.* at 253, 921 P.2d at 173. Thus, the issue of HRS § 91–7 standing was far from "well settled."

Of course, the doctrine of stare decisis must not be treated lightly. *See State v. Garcia,* 96 Hawai'i 200, 206, 29 P.3d 919, 925 (2001). However, under these circumstances, we seek to address an issue that was not well-supported or well-settled, and in doing so, review an ancillary holding of *Richard,* which in any event, was not necessarily intended to set precedent in this area. No reasoned or comprehensive discussion of the meaning of the phrase "[a]ny interested person," or the legislative history of HRS § 91–7, including its source in the MSAPA, has been had in any of our cases. Standing is a prudential doctrine, *see Citizens for Protection of North Kohala Coastline v. County of*

*Hawai'i,* 91 Hawai'i 94, 100, 979 P.2d 1120, 1126 (1999), and where no prudential reasons have ever been set forth in support of a particular standing requirement, review of that requirement is warranted, as we do so here.

IV.

We conclude that HAR § 3–122–66 manifestly exceeds the scope of the authority granted to the Board by the legislature. To reiterate, HRS § 91–7(b) provides that "[t]he court shall declare the rule invalid if it finds that it . . . exceeds the statutory authority of the agency[.]" The court in this case correctly determined that "HAR § 3–122–66, as a rule allowing waiver of HRS § 103D–304(g), contradicts or conflicts with the statute it attempts to implement."

In connection with the rule-making authority of administrative agencies,

"a public administrative agency possesses only such rulemaking authority as is delegated to it by a state legislature and may only exercise this power within the framework of the statute under which it is conferred. Administrative rules and regulations which exceed the scope of the statutory enactment they were devised to implement are invalid and must be struck down."

*Haole v. State,* 111 Hawai'i 144, 152, 140 P.3d 377, 385 (2006) (quoting *Stop H–3 Ass'n v. State Dep't of Transp.,* 68 Haw. 154, 161, 706 P.2d 446, 451 (1985)) (other citations omitted). Moreover, "an administrative agency can only wield powers expressly or implicitly granted to it by statute." *Id.* (quoting *Morgan,* 104 Hawai'i at 179–80, 86 P.3d at 988–89). Thus, the authority of the Board is delineated by the statutory authority given to it by the legislature. *See Puana,* 69 Haw. at 189, 737 P.2d at 870 (holding that an agency's authority "is limited to enacting rules which carry out and further the purposes of the legislation").

Of course, an administrative agency may also exercise its authority through implied powers not expressly granted, inasmuch as "the legislature cannot foresee all the problems incidental to carrying

out the duties and responsibilities of the agency." *Haole*, 111 Hawai'i at 152, 140 P.3d at 385 (citation omitted). However, such implied powers are limited to those "reasonably necessary to carry out the powers expressly granted." *Id.* (citation omitted).

■■■ Moreover, "[i]t is axiomatic that an administrative rule cannot contradict or conflict with the statute it attempts to implement." *Agsalud v. Blalack*, 67 Haw. 588, 591, 699 P.2d 17, 19 (1985) (citations omitted); *see Hyatt Corp. v. Honolulu Liquor Comm'n*, 69 Haw. 238, 241, 738 P.2d 1205, 1206–07 (1987). A rule that conflicts with an enabling statute must be declared invalid as outside the scope of the agency's authority. *See Tamashiro v. Dep't of Human Servs.*, 112 Hawai'i 388, 427, 146 P.3d 103, 142 (2006) (holding that where the agency's rule conflicted with HRS chapter 91, it exceeded the agency's authority).

The question in this case, then, is whether, in promulgating HAR § 3–122–66 the Board was either (1) exercising the statutory authority granted to it by the legislature, or (2) exercising its implied power "reasonably necessary to carry out the powers expressly granted." *Haole*, 111 Hawai'i at 152, 140 P.3d at 385. If not, then the regulation must be struck down.

### A.

#### 1.

■■■ First to be addressed is whether there is a conflict between the regulation and the procurement code. As explained, the court found that there was a conflict between HAR § 3–122–66 and HRS § 103D–304, inasmuch as HAR § 3–122–66 allows a waiver of HRS § 103D–304(g).

■■■ The plain language of the relevant statute, HRS § 103D–304(g) provides that: "The selection committee shall rank a minimum of three persons based on the selection criteria and send the ranking to the head of the purchasing agency." (Emphasis added.) Where the word "shall" is used in statutes, it is " 'generally imperative or mandatory.' " *Leslie v. Bd. of Appeals of Cnty. of Hawai'i*, 109 Hawai'i 384, 393, 126 P.3d 1071, 1081 (2006) (quoting *Black's Law Dictionary* 1375 (6th ed. 1990)). Thus, HRS § 103D–304(g) unambiguously requires that in every situation, the selection committee rank "a minimum of three persons."

The challenged regulation, HAR § 3–122–66(a)(1), on the other hand, provides that:

(a) If the names of less than three qualified persons are submitted pursuant to section 103D–304(g), HRS, the head of the purchasing agency may determine that:

(1) Negotiations under section 103D–304(h), HRS, may be conducted provided that:

(A) The prices submitted are fair and reasonable; and

(B) Other prospective offerors had reasonable opportunity to respond; or there is not adequate time to resolicit through public notice statements of qualifications and expressions of interest.

(Emphasis added.) By its language, then, this regulation provides for procurement procedures that may take place with "less than three qualified persons" under certain circumstances. HRS § 103D–202 (Supp. 1997) [19] gives the Board the "authority and responsibility to adopt rules, consistent with

---

**19.** HRS § 103D–202 provides in full as follows: Except as otherwise provided in this chapter, the [Board] shall have the authority and responsibility to adopt rules, consistent with this chapter, governing the procurement, management, control, and disposal of any and all goods, services, and construction. All rules shall be adopted in accordance with chapter 91; provided that the [Board] shall have the power to issue interim rules by procurement directives, which shall be except from the public notice, public hearing, and gubernatorial approval requirements of chapter 91. The in-

terim rules shall be effective for not more than eighteen months. The [Board] shall consider and decide matters of policy within the scope of this chapter including those referred to by a chief procurement officer. The [Board] shall have the power to audit and monitor the implementation of its rules and the requirements of this chapter, but shall not exercise authority over the award or administration of any particular contract, or over any dispute, claim, or litigation pertaining thereto.
(Emphases added.)

this chapter, governing the procurement, management, control, and disposal of any and all goods, services, and construction." (Emphasis added.) HAR § 3–122–66 "exceed[s] the scope" of the Board's authority to promulgate rules pursuant to HRS § 103D–202, because the rule provides for procurement to take place in a situation that the statute, by its plain language, would not allow, and thus is not consistent with HRS § 103D–304(g).

Specifically, where there are less than three qualified persons that can be considered for a professional services contract, the statute, by use of the word "shall" would disallow the procedures set forth in HAR § 3–122–66 to continue. HRS § 103D–304(g). The regulation, however, would permit procurement procedures to continue and allow for negotiations and award, despite that fact that less than three qualified persons were submitted for consideration by the head of the purchasing agency. HAR § 3–122–66. Manifestly, this regulation is in excess of the limitations in HRS § 103D–304(g), and thus the Board did not have the authority to promulgate such a rule under its general rulemaking authority set forth in HRS § 103D–202. The Board, then, exceeded the bounds of the "rule-making authority as [was] delegated to it by the state legislature," *Haole*, 111 Hawai'i at 152, 140 P.3d at 385, because the rule conflicts with HRS § 103D–304(g).

This case is similar in some respects to *Capua v. Weyerhaeuser Co.*, 117 Hawai'i 439, 184 P.3d 191 (2008). In *Capua*, this court considered whether a regulation promulgated by the director of the Labor and Industrial Relations (director) was inconsistent with a statute. 117 Hawai'i at 441, 184 P.3d at 193. The regulation deemed that an employee waived the right to certain vocational rehabilitation benefits when that employee had been awarded permanent partial disability (PPD) benefits. *Id.* at 447, 184 P.3d at 199. The relevant statute stated that " '[t]he director shall refer employees who may have or have suffered permanent disability as a result of work injuries ... for such physical and vocational rehabilitation services as are feasible[,]' " and that " '[t]he eligibility of any injured employee to receive other benefits under this chapter shall in no way be affected by the employee's entrance upon a course of physical or vocational rehabilitation as herein provided.' " *Id.* at 446, 184 P.3d at 198 (some emphasis omitted) (quoting HRS § 386–25 (1993)).

*Capua* concluded that, by its use of the mandatory term "shall", the statute mandated the director to refer an employee for vocational rehabilitation, including employees who had been awarded PPD benefits, contrary to the regulation. *Id.* Thus, Capua determined that the regulation was inconsistent with the statute, and therefore beyond the authority of the director to promulgate. *Id.* at 448, 184 P.3d at 200.

The same situation is presented by the instant case, where the statute requires that there "shall" be a minimum of three qualified persons considered, and the regulation, in contradiction, allows for a procedure whereby less than three qualified persons may be considered. As such, the regulation in the instant case is plainly outside the express rule-making powers granted to the Board.

2.

HAR § 3–122–66 is also outside the scope of the implied powers of the Board, because it directly conflicts with the procurement code. Where a regulation conflicts with a statute, the regulation cannot be said to be "reasonably necessary to carry out the powers" expressly granted to the administrative agency. *Puana*, 69 Haw. at 189, 737 P.2d at 870.

Moreover, although "the legislature cannot foresee all the problems incidental to carrying out the duties and responsibilities of the agency[,]" *id.* (citation omitted), as will be explained *infra*, the legislature in this instance apparently did foresee the possibility that there would be less than three qualified persons for consideration.

B.

In addition to the conflict between the plain language of the statute and regulation at issue, the legislative history of HRS § 103D–304 further supports the conclusion

that HAR § 3–122–66 is invalid because it "exceed[s] the scope of the statutory enactment [it was] devised to implement...." *Haole*, 111 Hawai'i at 152, 140 P.3d at 385. The requirement set forth by the legislature that there be a minimum of three persons identified by the selection committee was enacted to establish a base number for the procurement process when "professional services" contracts are at issue.

> "Professional services" means those services within the scope of the practice of architecture, landscape architecture, professional engineering, land surveying, real property appraisal, law, medicine, accounting, dentistry, public finance bond underwriting, public finance bond investment banking, or any other practice defined as professional by the laws of this State or the professional and scientific occupation series contained in the United States Office of Personnel Management's Qualifications Standards Handbook.

HRS § 103D–104 (Supp.2011).

As noted, the current version of the Procurement Code was enacted in 1993. *See* 1993 Haw. 1st Special Sess. Laws Act 8, § 1 at 37–38. Prior to 1993, the Procurement Code, at HRS Chapter 103, did not differentiate between the procurement of "professional services" and the procurement of other types of goods and services. *See* HRS Chapter 89 (1985 Repl.) The legislature's 1993 revisions to the HRS included a section specifically on the procurement of "professional services." See 1993 Haw. 1st Special Sess. Laws Act 8, § 2 at 49. This section, HRS § 103D–304, as set forth by the legislature in 1993, stated as follows:

> (e).... Unless fewer than three submissions have been received, the screening committee shall conduct discussions with at least three persons regarding the services which are required and the services they are able to provide. .... The committee shall provide the head of the purchasing agency with the names of the three persons who the committee concludes is the most qualified to provide the services required for the project, with a summary of each of their qualifications.

> (f) The head of the purchasing agency shall evaluate the summary of qualifications for each of the three persons provided by the screening committee and may conduct additional discussions with any of them.

*See id.* at 50 (emphasis added).

In 1995, the legislature amended HRS § 103D–304 to delete the phrase, emphasized above, stating that "[u]nless fewer than three submissions have been received, the screening committee shall conduct discussions with at least three persons ...." 1995 Haw. Sess. Laws Act 178, § 10 at 301–02. In 1997, the language "a minimum of three persons" was added to HRS § 103D–304, in reference to the number of qualified persons that needed to be evaluated, 1997 Haw. Sess. Laws Act 21, § 1 at 26, and in 2003, the phrase "minimum of three persons" was moved to its current location, in subsection (g) of the statute. 2003 Haw. Sess. Laws Act 52 § 5, at 78–79. Finally, in 2004, HRS § 103D–304(g) was amended again, leaving the "minimum of three persons" language intact. 2004 Haw. Sess. Laws Act 216, § 1 at 984.

Accordingly, in 1993, the legislature contemplated a situation in which there could be less than three initial submissions to the preliminary screening committee (later termed the "selection committee"). However, this language was deleted in 1995, and thereafter there was no longer a provision allowing for less than three persons to be considered in connection with professional services procurements. The relevant Conference Committee Report from 1995 states that the legislature amended the Procurement Code by "[c]larifying that agencies may publish more than one notice inviting persons engaged in providing professional services to submit current statements of qualifications and expressions of interest, and may publish additional notices if previously unanticipated needs for professional services arise." Conf. Comm. Rep. No. 38, in 1995 House Journal, at 969. Therefore, in connection with requiring no less than three persons to be considered, the legislature expanded the notice provisions inviting professional services persons to submit qualifications. *See id.* This legislative history indicates that the legislature

did consider the situation where there may be less then three qualified persons who could be identified for these types of procurements, and decided that the solution was to expand the invitation process to obtain more qualified professionals.

Relatedly, the 1995 revisions were aimed at the evaluation process via confidential discussions as well as the allowance for less than three submissions to the screening committee for consideration. *See* 1995 Haw. Sess. Laws Act 178, § 10 at 302. As constituted prior to 1995, then-subsection (e) of HRS § 103D–304 was in conflict with itself. It provided that the screening committee had to conduct confidential communications with at least three persons regarding their services, "[u]nless fewer than three submissions [had] been received." *Id.* But, two sentences later, it required that the screening committee "provide the head of the purchasing agency with the names of the three persons who the committee concludes is [sic] the most qualified to provide the services required for the project[.]" *Id.* The conflict arises because it is not clear how, where less than three submissions had been received, the screening committee could provide the head of the purchasing agency with "the names of the three persons" who were most qualified.

Pursuant to the 1995 revisions, the legislature altered the procedure so that the screening committee could conduct confidential discussions with any person submitted to it, and also resolved the conflict in the pre-1995 statute by deleting the provision contemplating a situation where "fewer than three" submissions had been received by the screening committee. *See id.* The alternative way the legislature could have resolved the conflict would have been by allowing the screening committee to submit the names of less than three persons to the head of the purchasing agency where the screening committee itself had received less than three submissions. Instead, the legislature deleted any reference to a situation where the screening committee might be presented with "fewer than three" submissions. *Id.*

Inasmuch as the legislature specifically required that there be a "minimum of three persons" considered, the Board was unquestionably acting outside the scope of its authority when it promulgated HAR § 3–122–66, because it acted in conflict with the legislature's purpose to ensure that there were three persons considered. Here, by overriding the solution to a problem that the legislature had already considered, the Board, in effect, implemented a legislative solution. It is not the role of administrative agencies to legislate outside the ken of their statutorily prescribed role. HAR § 3–122–66 thus exceeds the Board's express powers and any implied powers that the Board may exercise. As discussed, because HAR § 3–122–66 directly conflicts with HRS § 103D–304(g), it cannot be justified under the general rule-making authority of the Board, set forth in HRS § 103D–202. HRS § 103D–202 provides only that the Board shall adopt rules "consistent with [HRS Chapter 103D.]" HAR § 3–122–66 is not consistent with HRS Chapter 103D.

■ Also, it is not for this court to second-guess the legislature's intention when it set forth the specifics of the procurement process over a number of years and through numerous legislative amendments to the Procurement Code. It appears that that issue raised by HAR § 3–122–66 was in fact contemplated by the legislature, which in turn declined to provide for the remedial solution proffered by the Board. " '[N]either the courts nor the administrative agencies are empowered to rewrite statutes to suit their notions of sound public policy where the legislature has clearly and unambiguously spoken.' " *State v. Harada,* 98 Hawai'i 18, 50, 41 P.3d 174, 206 (2002) (Acoba, J., concurring and dissenting) (quoting 1 N. Singer, *Sutherland Statutory Construction* § 3.06, at 55 (5th ed. 1992–94)). As such, the statutory scheme must be upheld, requiring that the regulation be invalidated. *See Haole,* 111 Hawai'i at 152, 140 P.3d at 385.

V.

For the reasons described above, the statute and the legislative history demonstrates, the issue here was specifically contemplated and addressed by the legislature. There is no "gap" to be filled by the administrative agency.

### A.

First, the statutory mandate at issue in this case, that there be a "minimum of three persons" ranked by the selection committee, HRS § 103D–304(g), is in connection with the procurement of "professional services" only. "Professional services" includes recognized specialities where there are likely to be three qualified persons available and willing to provide "services within the scope of the practice of architecture, landscape architecture, professional engineering, land surveying, real property appraisal, law, medicine, accounting, dentistry," etc.

Second, even if there are less than three qualified persons available for a particular service, there are other options available, including resolicitation, for example. Thus, as explained, when the legislature amended HRS § 103D–304 as part of Act 178 in 1995, expressly deleting the language "[u]nless fewer than three submissions have been received," it noted that Act 178 also "[c]larifi[ed] that agencies may publish more than one notice inviting persons engaged in professional services to submit current statements of qualifications and expressions of interest, and may publish additional notices if previously unanticipated needs for professional services arise." Conf. Comm. Rep. No. 38, in 1995 House Journal, at 969. HRS § 103D–304(b) provides that additional notices shall be given if, *inter alia*, "[t]he response to the initial notice is inadequate[,]" or "[n]ew needs for professional services arise." Further, in the event that subsequent solicitation proves futile, or time does not allow for subsequent solicitation, the procuring entity may need to redefine the scope of the services sought.

Third, there are provisions in the Procurement Code that allow for the procurement of services in an emergency, HRS § 103D–307 (1993), or where the amount of the contract would be considered a "small purchase" pursuant to HRS § 103D–305 (Supp.2009). *See* HRS § 103D–304(j) (allowing contracts under a certain monetary amount to be negotiated "with at least two persons on the list of qualified persons"). Thus, in either of these situations, the procuring entity has options for procurement processes that do not run afoul of HRS § 103D–304(g).

Taking all of these factors into consideration, the statute would not lead to legally absurd results. State and county governments would not be precluded from procuring professional services such as architects and engineers where they can resolicit services, where they are able to redefine the scope of the work to obtain three qualified persons, where the procurement meets the statutory limits for a "small purchase" procurement, HRS § 103D–305, and where the procurement is an emergency procurement as described in HRS § 103D–307. Consequently, the legislature obviously accounted for those instances where three qualified persons might not be available.

By doing so, the legislature manifested its adherence to the proposition that in the absence of these exceptions, that no award be made unless three qualified bidders are considered. The wisdom of that determination is committed to the legislature. *See County of Kauaʻi v. Baptiste*, 115 Hawaiʻi 15, 60, 165 P.3d 916, 961 (2007) (Acoba, J., dissenting, joined by Duffy, J.) ("[N]ot all wisdom resides in the judiciary. In our democracy, governance is a tripartite function."). The legislature has clearly spoken, by virtue of the express language and legislative history of HRS § 103D–304. Accordingly, the qualifications on the state's and local government's ability to procure professional services do not produce an erroneous result.

### B.

Where the regulation provides for procedures outside those authorized by the legislature, it necessarily follows that there is harm to the public. Where a contract award may be based on a consideration of less than the minimum number of "qualified persons" required by the statute, there may be an unwarranted basis for a review committee to determine that less than three persons is permissible.

As currently constituted, the text requiring three qualified persons effectuates the legislative purposes behind the Procurement Code, including "[p]roviding increased econo-

my in procurement activities and maximizing to the fullest extent practicable the purchasing value of public funds," and "[f]ostering effective broad-based competition within the free enterprise system[.]" 1993 Haw. 1st Special Sess. Laws Act 8, § 1 at 38–39. By mandating that there be "a minimum of three persons" ranked in all professional services procurement not otherwise exempted from HRS § 103D–304, the Procurement Code ensures that the procuring entity is incentivized to obtain the widest possible range of qualified persons for a particular project.

## C.

Lastly, the Board alleges that HAR § 3–122–66 was adopted in accordance with its authority under HRS § 103D–102(b)(4)(L). As noted previously, HRS § 103D–102(b)(4) provides that

(b) "[Chapter 103D] shall not apply to contracts by government bodies:

. . . .

(4) To procure the following goods or services which are available from multiple sources <u>but for which procurement by competitive means is either not practicable or not advantageous to the State:</u>

(A) Services of expert witnesses . . .

(B) Works of art for museum or public display;

(C) Research and reference materials including books, maps, periodicals, and pamphlets . . .

(D) Meats and foodstuffs for the Kalaupapa settlement;

(E) Opponents for athletic contests;

(F) Utility services whose rates or prices are fixed by regulatory processes or agencies;

(G) Performances, including entertainment, speeches, and cultural and artistic presentations;

(H) Goods and services for commercial resale by the State;

(I) Services of printers, rating agencies, support facilities, fiscal and paying agents, and registrars for the issuance

and sale of the State's or counties' bonds;

(J) Services of attorneys employed or retained to advise, represent or provide any other legal services to the State or any of its agencies, on matters arising under laws of another state or foreign country, or in an action brought in another state, federal, or foreign jurisdiction, when substantially all legal services are expected to be performed outside this State;

(K) Financing agreements under chapter 37D; and

(L) <u>Any other goods or services which the policy board determines by rules or the chief procurement officer determines in writing is available from multiple source but for which procurement by competitive means is either not practicable or not advantageous to the State[.]</u>

(Emphases added.)

■ However, it is plain that applying the canon of statutory construction known as ejusdem generis, HAR § 3–122–66 cannot be reconciled under HRS § 103D–102(b)(4)(L). "The doctrine of ejusdem generis states that 'where general words follow specific words in a statute, those general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" *Singleton v. Liquor Comm'n of Hawai'i*, 111 Hawai'i 234, 242 n. 14, 140 P.3d 1014, 1022 n. 14 (2006) (quoting *Peterson v. Hawaii Elec. Light Co.*, 85 Hawai'i 322, 328, 944 P.2d 1265, 1271 (1997) (other citation omitted)).

Subsection (L) is meant to identify particular goods or services exempt from the requirements of the Procurement Code. The general words "[a]ny other goods or services" in subsection (L) must, under the doctrine of ejusdem generis, be construed in connection with the list of items (A) through (K) preceding it. Items (A) through (K) enumerate <u>specific types of goods or services,</u> for example, works of art, research and reference materials, out-of-state attorney services, printers, and performances. *See* HRS § 103D–102(b)(4)(A)-(K). The Board would construe (L) not to exempt <u>types</u> of goods or services, but instead to provide an

exemption when a particular factual situation is posited—specifically, where less than three qualified persons are identified under HRS § 103D–304. This would give the general words "[a]ny other goods or services" in HRS § 103D–102(b)(4)(L) a meaning dissimilar to the specific exemptions enumerated at HRS § 103D–102(b)(4)(A)–(K), and therefore would be inconsistent with established principles of statutory construction. Accordingly, the factual situation of less than three qualified persons under the Board's rule HAR § 3–122–66, cannot be rationalized as an unenumerated exception within the scope of HRS § 103D–102(b)(4).

Also, HRS § 103D–102(b)(4)(L) provides an exemption only for "[a]ny other goods or services which the policy board determines by rules or the chief procurement officer determines in writing is available from multiple sources but for which procurement by competitive means is either not practicable or not advantageous to the State[.]" *Id.* (emphasis added). The "rule[ ]" providing an exemption for these other goods and services is HAR § 3–120–4 (2011),[20] which specifically includes an Exhibit listing the specific goods and services that the Board has deemed exempt from HRS chapter 103D, "because although such goods and services may be 'available from multiple sources,' their 'procurement by competitive means would be either not practicable or not advantageous to the State.'" HAR § 3–120–4 (quoting HRS § 103D–102(b)(4)). The Exhibit referenced in HAR § 3–120–4 includes services such as "[b]urial services" and "[c]ourt reporter services", but does not include "professional services" as defined in HRS § 103D–104. HAR § 3–122–66, in contrast, does not reference any language from HRS § 103D–102(b)(4),

and focuses, again, on the number of qualified persons available rather than the type of good or service being procured. Thus, it is plain that HAR § 3–120–4, and not HAR § 3–122–66, is the Board's rule by which it exempts goods or services not already enumerated in HRS § 103D–102(b)(4).

HAR § 3–122–66 is also inconsistent with HRS § 103D–102(b)(4)(L), because HAR § 3–122–66 does not require that the "chief procurement officer determines in writing", HRS § 103D–102(b)(4)(L), that the specific good or service is exempt from HRS Chapter 103D. Rather, HAR § 3–122–66 allows the "head of the purchasing agency" to determine that negotiations may be conducted "[i]f the names of less then three qualified persons are submitted...." Therefore, for numerous reasons, HRS § 103D–102(b)(4)(L) cannot serve as a basis on which to justify the Board's promulgation of HAR § 3–122–66, which is outside the scope of the Board's authority.

### VI.

Finally, the court did not err with respect to the points of error raised by Asato on cross-appeal. First, the court did not err in refusing to declare that HAR § 3–122–66 "has never been valid and has always been ultra vires and void ab initio." Instead, the court correctly complied with the language of HRS § 91–7 and declared the statute invalid. Second, the court did not err in "refusing to declare that every government contract issued under the invalid authority of HAR § 3–122–66 is void ab initio," inasmuch as the validity of those contracts was not before the court.[21] Third, the court did not err in refus-

---

**20.** HAR § 3–120–4 provides, in relevant part:
§ **3–120–4. Procurements exempt from chapter 103D, HRS.**
(a) Notwithstanding the intent of chapter 103D, HRS, to require governmental bodies to procure their goods and services through competitive bidding, it is acknowledged that there may be situations where procurement by competitive means is either not practicable or not advantageous to the State.
(b) Exhibit A titled "Procurements Exempt From Chapter 103D, HRS" dated 03/17/2011, is located at the end of this chapter. This exhibit provides a list of goods and services

which the procurement policy board has determined to be exempt from chapter 103D, HRS, because although such goods and services may be available from multiple sources, their procurement by competitive means would be either not practicable or not advantageous to the State.
(Emphasis added.)

**21.** The principles, as addressed herein, pertain to the universal procurement of all professional services contracts and not to any particular contract or "project."

354

ing to grant a preliminary and permanent injunction prohibiting use of HAR § 3–122–66 because the legal remedy of declaring HAR § 3–122–66 invalid constituted an adequate legal remedy rendering an injunction unnecessary.[22]

### A.

As to Asato's first point of error on cross-appeal, Asato's argument regarding the validity of HAR § 3–122–66 was apparently linked to his contention that the court should have declared every award issued under HAR § 3–122–66 invalid, inasmuch as Asato maintained that the contracts were "void ab initio" because HAR § 3–122–66 "has never been valid." However, as explained *infra*, the court correctly declined to declare every contract issued under HAR § 3–122–66 invalid.

The court's ruling was consistent with HRS § 91–7. HRS § 91–7 states that "the court shall declare the rule invalid if it finds that it violates ... statutory provisions, or exceeds the statutory authority of the agency." (Emphasis added.) In consonance with the plain meaning of HRS § 91–7, the court declared that "HAR § 3–122–66 is invalid, pursuant to the statutory authority under HRS § 91–7." (Emphasis added.) Asato points to nothing in the language or legislative history of HRS § 91–7 requiring the court to declare that a rule "has never been valid," instead of ruling that the rule "is

invalid." Hence, the court satisfied the statutory mandate of HRS § 91–7.

### B.

#### 1.

■ As to Asato's second point of error on cross-appeal, the court did not err in refusing to rule that every government contract issued under HAR § 3–122–66 was void ab initio. In his Complaint, Asato requested a declaratory judgment that HAR § 3–122–66 was invalid pursuant to HRS § 91–7 and HRS § 632–1 and also requested that "all existing contracts in which HAR § 3–122–66 was used ... be rescinded as being void ab initio." However, Asato did not cite any authority allowing the court to rescind all contracts authorized under HAR § 3–122–66.

Similarly, Asato brought his motion for summary judgment under, *inter alia*, HRS § 91–7 and HRS § 632–1, and maintained that "[t]here are no genuine disputes of material fact as to the meaning of the 'minimum of three persons' requirement in HRS § 103D–304(g) and the ... inconsistency of HAR § 3–122–66 which nullifies the 'minimum of three persons requirement.'" In his memorandum in support of his motion, Asato again requested that the court "declare that every government contract issued under the invalid authority of HAR § 3–122–66 is void ab initio." However, Asato did not cite any authority allowing the court to declare every government contract invalid.[23]

**22.** Asato's Opening Brief also raised, as additional points of error (4) that "the attorney general and [the Board] improperly contended and participated in the enactment and perpetuation of HAR § 3–122–66[,]" (5) that "the attorney general and [the Board] have disregarded and violated their public trust responsibilities," and (6) that "the attorney general and [the Board] [should] be judicially barred or estopped from asserting the issues in its appeal[.]" However, these are not truly "points of error" inasmuch as they do not state an "alleged error committed by the court[.]" Hawai'i Rules of Appellate Procedure Rule 28(b)(4)(i). Moreover, Asato apparently concedes that these issues were "not argued before the [court]." *See State v. Moses*, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[.]"). Thus, these contentions of error are not discussed further.

**23.** In Asato's memorandum, he stated that "all contracts issued under the invalid authority of HAR § 3–122–66 are [ ] void ab initio," and cited to Exhibits 1 and 4. Exhibit 1 was a copy of Asato's complaint, which identified 26 contracts that Asato believed were issued under HAR § 3–122–66. Exhibit 4 was a copy of a "Department of Transportation procurement award for Architecture and Engineering professional services," showing that the "selection list for th[e] contract did not have the 'minimum of three persons required by HRS § 103D–304(g)." Asato also attached as Exhibit 19 the Board's Answers to Interrogatories, which admitted that at least 11 of the 26 contracts identified in Asato's complaint "were procurements awarded pursuant to HAR § 3–122–66."

## 2.

As an initial matter, it is unclear whether Asato's request that the court rule that every contract awarded under HAR § 3–122–66 is invalid is brought under his declaratory action or his injunctive action. In any event, first, Asato's request for declaratory judgment did not permit the court to invalidate each contract awarded under HAR § 3–122–66. HRS § 91–7 only allows parties to "obtain a judicial declaration as to the validity of an agency rule." (Emphasis added.) Thus, this court has explained that "HRS § 91–7 does not give the circuit court jurisdiction to hear a challenge to the application of a rule" but instead allows for "attacks on a rule's validity." *Puana*, 69 Haw. at 189, 737 P.2d at 869 (emphasis added). In awarding contracts pursuant to HAR § 3–122–66, agencies "applied" that rule. Hence, Asato's challenge to every contract awarded under HAR § 3–122–66 could not be brought under HRS § 91–7.

■ Additionally, in an action brought under HRS § 632–1, it must be demonstrated that "antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation," or "a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein." HRS § 632–1. In other words, "'the question is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant a declaratory judgment.'" *Kahoʻohanohano v. State*, 114 Hawaiʻi 302, 332, 162 P.3d 696, 726 (2007) (Acoba, J., concurring) (quoting *United Public Workers, AFSCME, Local 646 v. Yogi*, 101 Hawaiʻi 46, 57, 62 P.3d 189, 200 (2002)) (emphasis added). Absent any rendition of the circumstances surrounding each contract, it cannot be determined from the allegations whether there is a "substantial controversy" as to a particular contract that is "of sufficient immediacy and reality to warrant a declaratory judgment." *Id.* Hence, a declaratory judgment generally declaring that all the contracts issued under HAR § 3–122–66 are invalidated cannot be issued pursuant to HRS § 632–1.

Finally, the court could not have invalidated every contract awarded under HAR § 3–122–66 as "ancillary relief" under either HRS § 91–7 or HRS § 632–3.[24] HRS § 632–3 provides that "[f]urther relief based on a declaratory judgment may be granted whenever necessary or proper, after reasonable notice and hearing, against any adverse party whose rights have been adjudicated by the judgment." (Emphasis added.) Here, however, the recipients of contracts awarded under HAR § 3–122–66 were not made parties to the case, and therefore their rights have not been "adjudicated by the judgment." Consequently, the court could not have invalidated those contracts on the basis of "ancillary relief."

■ In his Reply Brief, Asato argued for the first time that, in addition to support-

---

24. In his Reply Brief, Asato cited *Costa v. Sunn*, 5 Haw.App. 419, 697 P.2d 43 (1985) for the proposition that "the court's authority to grant ancillary relief under § 91–7 is coextensive with its authority under HRS Chapter 632." However, Asato made no further argument as to why "ancillary relief" in appropriate in this case.

In *Costa*, the plaintiff challenged new rules for public assistance programs promulgated by the Department of Social Services and Housing (DSSH). 5 Haw.App. at 420, 697 P.2d at 45. The plaintiff brought a class action on behalf of "all residents of the State of Hawaiʻi and members of their public assistance households who were, or will be, adversely affected by [new rules]." *Id.* at 422, 697 P.2d at 46. In addition to invalidating the new rules, the court ordered DSSH to reinstate the old rules and "reinstate all recipients or applicants who may have had their benefits reduced, terminated, or denied" pursuant to the new rules. The court held that these action were valid under the court's authority to grant "ancillary relief." *Id.* at 425, 697 P.2d at 48.

However, *Costa* cited HRS § 632–3 as authority for granting "ancillary relief." *Id.* at 425, 697 P.2d at 48. As explained *infra*, under HRS § 632–3 ancillary relief is only available against parties whose rights have been adjudicated. Inasmuch as *Costa* was a class action, all of the parties were before the court and thus their rights were adjudicated. Here, in contrast, Asato has requested relief against parties who are not before the court. Hence, *Costa* is inapposite.

ing his standing to sue as a taxpayer, *Lucas* and *Federal Electric* served as a basis to invalidate the contracts awarded under HAR § 3–122–66. According to Asato, those cases demonstrate that, following a suit by a taxpayer, courts have a "continuing obligation to invalidate unlawful ... government contracts." However, as the Board points out, generally the parties to the contract must be made parties to a suit in which the contract is challenged. *See Haiku Plantations Ass'n v. Lono,* 56 Haw. 96, 102, 529 P.2d 1, 5 (1974) ("This court cannot undertake to hear and determine questions affecting the interests of these absent persons unless they are made parties and have had an opportunity to come into court." (internal quotation marks omitted)).[25] Moreover, any contract remedies must be tailored to the facts of each case. *See Air Terminal Servs.,* 47 Haw. at 509, 393 P.2d at 67 (explaining the "unavailability of mandamus to attack a public contract when the contract has not only been executed but possession has been taken and the concessionaire is operating under it").[26] Thus, neither case cited by Asato would permit the court to simply declare all the contracts invalid under the circumstances here.[27]

## C.

As to Asato's third point of error on cross-appeal, it has been explained that "courts generally will refuse to grant injunctive relief

unless plaintiff demonstrates that there is no adequate legal remedy[.]" Wright and Miller, *Federal Practice and Procedure* § 2944; *see also Punohu v. Sunn,* 66 Haw. 485, 487, 666 P.2d 1133, 1135 (1983) (holding that injunctive relief was inappropriate because "the same relief can be obtained through an application for a stay in the administrative appeal under Chapter 91," and therefore "there is no lack of an adequate remedy at law available to the appellees"). Here, Asato requested injunctions restraining the Board from "using HAR § 3–122–66 in the procurement of professional services under HRS § 103D–304[.]" However, by declaring HAR § 3–122–66 invalid, the court effectively ruled that HAR § 3–122–66 "is void and cannot be enforced." *Hyatt Corp.,* 69 Haw. at 240, 738 P.2d at 1206. Hence, the court's ruling effectively prohibits the Board from using HAR § 3–122–66 in the procurement of professional services. In other words, the remedy provided by the court accomplished the same purpose as Asato's requested injunctions. Consequently, there was "an adequate remedy at law," and injunctive relief was not appropriate.

## VII.

Inasmuch as we hold that Asato prevailed on his HRS § 91–7 challenge to the validity of HAR § 3–122–66, we must decide

---

**25.** Asato apparently argues that, based on *Haiku Plantations,* if all of the government contracts were invalidated, "the identification and disposition of affected government contracts could take place on remand or in a separate proceeding." However, in *Haiku Plantations,* the court "reverse[d] and vacate[d]" the portions of a declaratory judgment that were adverse to the parties not before the court, and stated that further adjudication could be had "in a future proceeding in which all of those having an interest are made parties before the court." 56 Haw. at 102, 529 P.2d at 6. Plainly, then, under *Haiku Plantations* it would be inappropriate to make any determination regarding the validity of government contracts when the parties to those contracts are not before the court.

**26.** In *Air Terminal Servs.,* this court indicated that the disappointed bidder should have sought injunctive relief because the contract had already been issued. *See Air Terminal Servs.,* 47 Haw. at 509, 393 P.2d at 67 (rejecting the disappointed bidder's argument that "the case should be treat-

ed the same as an injunctive suit"). However, this court explained that because the recipient of the contract had been dismissed from the suit with prejudice, and the disappointed bidder had failed to amend the complaint to state a claim for injunctive relief against the recipient of the contract, the action must be treated as a mandamus action, and that mandamus was not available "where the performance of the contract has proceeded as far as it has here." *Id.* at 506, 510, 393 P.2d at 66, 68. Thus, under *Air Terminal Servs.,* it is apparent that the recipient of the contract is a necessary party in a challenge to void a contract that has already been awarded and partially performed.

**27.** Inasmuch as the parties to the contracts awarded are not before the court, *see* discussion *supra,* we do not discuss Asato's contention that the parties who have already performed work on the contracts issued under HAR § 3–122–66 are not entitled to any compensation on such contracts because the contracts are void and against public policy.

whether the court properly granted attorney's fees and costs pursuant to the private attorney general doctrine.

■■■ The private attorney general doctrine is an equitable doctrine and an exception to the traditional "American Rule" that each party must pay its own litigation expenses. *See Honolulu Const. & Draying Co. v. State, Dep't of Land & Nat. Res.*, 130 Hawai'i 306, 308, 310 P.3d 301, 303 (2013).

> Courts applying the doctrine consider <u>three basic factors:</u> (1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, and (3) the number of people standing to benefit from the decision.

*Id.* (emphasis in original) (quoting *Sierra Club v. Dep't of Transp. of State of Hawai'i*, 120 Hawai'i 181, 218, 202 P.3d 1226, 1263 (2009) (*Sierra Club II* )) (other citation omitted).

■■■ The court's determination as to the private attorney general doctrine is reviewed "under the abuse of discretion standard," however, "we review *de novo* whether the trial court disregarded rules or principles of law that arise in deciding whether or not a party satisfies the three factors of the private attorney general doctrine." *Id.* at 313, 310 P.3d at 308. In determining whether Asato was in fact entitled to fees, we need not address all three factors, inasmuch as we conclude that Asato is unable to satisfy the third prong of the doctrine.

As to the third criterion, "the number of people standing to benefit from the decision," *Sierra Club*, 120 Hawai'i at 218, 202 P.3d at 1263 (citations omitted), the court determined that "proper enforcement of the procurement code via enforcement through HRS § 103D–304 is of benefit to all citizens of the state." The Board contends, on the other hand, that "even if invalidation of the [r]ule could benefit someone in some theoretical case, there is no showing that even a handful of people, let alone many people, would benefit."

This court has found that the third prong of the private attorney general doctrine has

been satisfied where plaintiffs have vindicated causes that included procedural rights related to environmental review, *see Sierra Club v. Dept. of Transp.*, 115 Hawai'i 299, 304, 167 P.3d 292, 297 (2007) (*Sierra Club I* ), Native Hawaiian cultural rights, *Maui Tomorrow v. State, Bd. of Land & Nat. Res.*, 110 Hawai'i 234, 245, 131 P.3d 517, 528 (2006), and historic preservation, *Honolulu Const. & Draying Co.*, 130 Hawai'i at 319, 310 P.3d at 314. We have recognized that the third prong of the doctrine had been met where "all of the citizens of the state, present and future, stood to benefit from the decision." *In re Water Use Permit Applications*, 96 Hawai'i 27, 31, 25 P.3d 802, 806 (2001) (*Waiahole II* ) (citing *In re Water Use Permit Applications*, 94 Hawai'i 97, 98, 9 P.3d 409, 510 (2000) (*Waiahole I* ) (recognizing the "ultimate importance of these matters to the present and future generations of our state")). In connection with equitable rationales underlying the doctrine, we have also explained that the types of causes to which the private attorney general doctrine is applicable, "<u>do not involve the fortunes of a single individual to the extent necessary to encourage their private vindication in the courts.</u>" *Honolulu Const. & Draying Co.*, 130 Hawai'i at 315, 310 P.3d at 310 (emphasis in original) (quoting *Waiahole II*, 96 Hawai'i at 30, 25 P.3d at 802 (quoting *Serrano v. Priest*, 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303, 1313–14 (1977))).

In the instant case, the specific holding would apply in future cases where there are fewer than three qualified bidders for professional services contracts pursuant to HRS § 103D–304(g). Asato argued, however, that all taxpayers will benefit from this action because they are entitled to expect "that all public funds will be spent lawfully and prudently[.]"

But, there may be, for example, providers of professional services who would be individually affected or involved sufficiently to encourage them to bring a suit challenging the validity of a regulation promulgated pursuant to the Procurement Code. *See Waiahole II*, 96 Hawai'i at 30, 25 P.3d at 802. Thus, under the circumstances, this case does not meet the third criterion of the private attor-

ney general doctrine, and accordingly Asato is not entitled to attorney's fees and costs.

## VIII.

Subject to the reasons set forth above, the court's August 15, 2012 judgment is affirmed in part and vacated in part, and the court's September 4, 2012 order awarding attorney's fees and costs is reversed.

**Dissenting Opinion by RECKTENWALD, C.J., in which NAKAYAMA, J., Joins.**

I respectfully dissent from the majority's conclusion that Lloyd Asato has standing to challenge the validity of Hawai'i Administrative Rule (HAR) § 3–122–66 as an "interested person" under Hawai'i Revised Statutes (HRS) § 91–7. For more than thirty years this court has applied the injury in fact test to determine whether a plaintiff has standing to challenge an administrative rule under HRS § 91–7. *See Life of the Land v. Land Use Comm'n of State of Haw.,* 63 Haw. 166, 623 P.2d 431 (1981); *Richard v. Metcalf,* 82 Hawai'i 249, 921 P.2d 169 (1996). The majority abandons this well settled precedent in favor of a rule which, in effect, grants standing under HRS § 91–7 to any person who is willing to bring suit. Because the legislature did not provide for such expansive standing under HRS § 91–7, I would hold that the injury in fact test does apply, and that Asato failed to demonstrate standing under this test.

I would further hold that Asato has not satisfied the requirements of taxpayer standing because he failed to demonstrate that the use of HAR § 3–122–66 increased either his personal taxes or those of taxpayers generally. *See Iuli v. Fasi,* 62 Haw. 180, 184, 613 P.2d 653, 656 (1980) ("The petition must allege loss in revenues resulting in an increase in plaintiff's tax burdens or to taxpayers in general."). Moreover, damage to Asato cannot be presumed because the facts of the instant case are distinguishable from the "special situation" presented in *Federal Electric Corporation v. Fasi,* 56 Haw. 57, 527 P.2d 1284 (1974).

Finally, I would hold that Asato has failed to demonstrate that he has standing under HRS § 632–1. Because Asato has failed to carry his burden of demonstrating standing, I would vacate the August 15, 2012 final judgment of the Circuit Court of the First Circuit and remand the case with instructions to dismiss the case for lack of jurisdiction.

### I. Introduction

Asato filed suit against the State of Hawai'i Procurement Policy Board (the Board) challenging HAR § 3–122–66. That rule provides guidance to the heads of purchasing agencies for when fewer than three qualified persons have been identified to be considered for professional services contracts with the state or a county government. *See* HAR § 3–122–66. The circuit court granted Asato summary judgment and denied the Board's cross-motion for summary judgment, holding that Asato had standing to maintain this action, and that HAR § 3–122–66 is invalid because it conflicts with HRS § 103D–304(g). The Board and Asato filed cross-appeals and this court granted discretionary transfer pursuant to HRS § 602–58(b).[1]

### A. Circuit court proceedings

In his complaint, Asato asserted two alternative bases for standing. First, he alleged that he had standing "because he has been injured and will continue[ ] to be injured by the state and county governments' unlawful use of HAR § 3–122–66 as a perfunctory basis to award contracts for professional services in violation of the 'minimum of three persons' requirement [in] HRS § 103D–304(g)." Asato alleged that contracts awarded pursuant to HAR § 3–122–66 violated the policies sought to be advanced by the legislature in adopting the Procurement Code, including " '[p]roviding increased economy in procurement activities and maximizing to the fullest extent practicable the purchasing value of public funds.' " (Alteration in original) (Quoting 1993 Haw. Special Sess. Laws Act 8, § 1 at 38). Asato attached to his complaint information relating to twenty-six con-

---

1. The circuit court denied Asato's request to declare as void every contract awarded pursuant to HAR § 3–122–66. This was the basis for Asato's cross-appeal.

tracts that were purportedly awarded with fewer than three persons being considered by the head of the purchasing agency, including what Asato described as the four "largest professional services contracts to date for the City and County of Honolulu, all of which [were] for the Honolulu High Capacity Transit Corridor, the rail project . . . totaling over $144 million."

Alternatively, Asato asserted that he had standing as a taxpayer under *Iuli* and *Federal Electric Corporation*. As discussed below, in *Iuli* this court set forth "specific requirements which must be met before standing to taxpayers is granted." 62 Haw. at 184, 613 P.2d at 656. As relevant here, the *Iuli* court concluded that an individual "must allege loss in revenues resulting in an increase in plaintiff's tax burdens or to taxpayers in general." *Id.* The *Iuli* court also noted the special situation presented in *Federal Electric* where "deleterious consequences to taxpayers" could be presumed because the bidding procedures used were patently improper and defective. *Id.* at 186, 613 P.2d at 657.

Asato and the Board then filed cross-motions for summary judgment. In his motion, Asato maintained that he had standing as an "interested person" under HRS § 91-7 "to bring a declaratory judgment action to challenge the validity of any agency rule." Asato asserted that the purpose of a declaratory judgment proceeding is to " 'remove uncertainty from legal relations and clarify, quiet, and stabilize them before irretrievable acts have been undertaken, to enable an issue of questioned status or fact, on which a whole complex of rights may depend, to be expeditiously determined[.]' " (Quoting *Citizens Against Reckless Dev. v. Zoning Bd. of Appeals of City & County of Honolulu*, 114 Hawai'i 184, 196 n. 13, 159 P.3d 143, 155 n. 13 (2007)).

Asato further maintained that he had standing as a taxpayer because "he has been injured in fact and will continue to be injured by the unlawful use by state and county governments of HAR § 3-122-66 as a presumptive, lawful basis to award nonemergency contracts for professional services under HRS § 103D-304 in spite of this administrative rule clearly violating [ ] the 'minimum of three persons' requirement in HRS § 103D-304(g)[.]"

In its cross-motion for summary judgment, the Board argued that Asato did not have standing as an "interested person" under HRS § 91-7 because he failed to establish any actual or threatened injury. Citing *Life of the Land* and *Richard,* the Board argued that Asato failed to show "such a personal stake in the outcome of a determination of the validity of HAR § 3-122-66 to justify judicial intervention on his behalf."

The Board further argued that injury to Asato could not be presumed for purposes of taxpayer standing. The Board explained that *Federal Electric* was decided prior to the enactment of the Procurement Code, and that the facts in this case were not analogous to the special circumstance recognized by the *Federal Electric* court.

In his response to the Board's motion, Asato maintained that he was an " 'interested person' as a taxpayer" because HRS § 103D-304(g) "is part of a legislatively mandated, established government contract procurement process in Hawaii that is intended to prudently, fairly, and economically expend taxpayer funds for all public works projects" that require professional services. Asato argued that if he did not have standing to challenge HAR § 3-122-66, "then no one will ever have standing to challenge this type of administrative rule."

The circuit court concluded that Asato had standing under HRS § 91-7. The circuit court explained that "[t]he standing requirement for HRS § 91-7 is encapsulated by the phrase 'any interested person.' Here, the court finds that, that has indeed been brought. An interested person seeks to obtain a judicial declaration." The circuit court explained that it also "would have found" that Asato satisfied the long established three-part injury in fact test. Specifically, the circuit court explained that Asato demonstrated an actual or threatened injury by alleging that HAR § 3-122-66 is inconsistent with HRS § 103D-304. The circuit court also concluded that Asato's actual or threatened injury was directly traceable to HAR § 3-122-66, "especially in concerning integri-

ty of contracts using taxpayer funds." Finally, the circuit court concluded that a decision in Asato's favor would render HAR § 3–122–66 invalid, "which is the direct object of [ ] Asato's lawsuit." The circuit court did not specifically address taxpayer standing.

## II. Discussion

On appeal, the Board argues that the circuit court erred in concluding that Asato had standing under HRS § 91–7, that Asato failed to demonstrate taxpayer standing, and that he does not have standing under HRS § 632–1. For the reasons set forth below, I agree with the Board that Asato has failed to demonstrate standing under any one of his three alternative theories.

### A. Prudential rule of judicial power: standing

The courts of Hawai'i are not subject to a "cases or controversies" limitation like that imposed on the federal judiciary by Article III, Section 2 of the United States Constitution. *Trs. of Office of Hawaiian Affairs v. Yamasaki*, 69 Haw. 154, 170, 737 P.2d 446, 455–56 (1987). Like the federal government, however, "ours is one in which the sovereign power is divided and allocated among three co-equal branches." *Id.* at 170–71, 737 P.2d at 456. Thus, even in the absence of constitutional restrictions, courts must still "carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government." *Sierra Club v. Dep't of Transp.*, 115 Hawai'i 299, 319, 167 P.3d 292, 312 (2007) (quoting *Life of the Land*, 63 Haw. at 172, 623 P.2d at 438).

This court has therefore long recognized that judicial power should be limited to those questions capable of judicial resolution and presented in an adversary context. *Sierra Club*, 115 Hawai'i at 319, 167 P.3d at 312 (quoting *Life of the Land*, 63 Haw. at 171–72, 623 P.2d at 438). Thus, "prudential rules of judicial self-governance founded in concern about the proper—and properly limited—role of courts in a democratic society are always of relevant concern." *State v. Fields*, 67 Haw. 268, 274, 686 P.2d 1379, 1385 (1984)

(quoting *Life of the Land*, 63 Haw. at 172, 623 P.2d at 438) (quotation marks omitted). "In short, judicial intervention in a dispute is normally contingent upon the presence of a 'justiciable' controversy." *Sierra Club*, 115 Hawai'i at 319, 167 P.3d at 312 (quoting *Life of the Land*, 63 Haw. at 172, 623 P.2d at 438).

"Standing is that aspect of justiciability focusing on the party seeking a forum rather than on the issues he wants adjudicated." *Life of the Land*, 63 Haw. at 172, 623 P.2d at 438. In other words, standing is concerned with whether a particular party is an appropriate plaintiff. *County of Haw. v. Ala Loop Homeowners*, 123 Hawai'i 391, 406 n. 20, 235 P.3d 1103, 1118 n. 20 (2010); *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994). The plaintiff bears the burden of establishing that he or she has standing. *Hawai'i Med. Ass'n v. Hawai'i Med. Serv. Ass'n, Inc.*, 113 Hawai'i 77, 95, 148 P.3d 1179, 1197 (2006). "A plaintiff without standing is not entitled to invoke a court's jurisdiction." *Mottl v. Miyahira*, 95 Hawai'i 381, 388, 23 P.3d 716, 723 (2001).

"[T]he crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his or her behalf." *Sierra Club*, 115 Hawai'i at 318, 167 P.3d at 311 (quoting *In re Application of Matson Navigation Co. v. Fed. Deposit Ins. Corp.*, 81 Hawai'i 270, 275, 916 P.2d 680, 685 (1996)) (internal quotation marks omitted). In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, this court employs a three-part injury in fact test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury. *Akinaka v. Disciplinary Bd. of Haw. Supreme Court*, 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999) (citing *Bush v. Watson*, 81 Hawai'i 474, 479, 918 P.2d 1130, 1135 (1996)).

Because the injury in fact elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Sierra Club v. Haw. Tourism Auth.*, 100 Hawai'i 242, 250, 59 P.3d 877, 885 (2002) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (internal quotation marks, brackets, and citation omitted). "In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." [2] *Id.* (internal quotation marks and citation omitted).

## B. Asato failed to demonstrate standing under HRS § 91-7

### 1. Standing under HRS chapter 91

Chapter 91 identifies two circumstances in which a plaintiff may seek judicial review of an administrative agency's action. First, HRS § 91-14 provides that "[a]ny person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter[.]" This court has long held that in order to have standing under this section, a plaintiff must demonstrate both injury in fact and that he or she was involved in the administrative proceeding that culminated in the unfavorable decision. *Pele Def. Fund*, 77 Hawai'i at 69, 881 P.2d at 1215 (citing *Mahuiki v. Planning Comm'n*, 65 Haw. 506, 514-15, 654 P.2d 874, 879-80 (1982)).

Second, HRS § 91-7 provides that "[a]ny interested person may obtain a judicial declaration as to the validity of an agency rule ... by bringing an action against the agency in the circuit court of the county in which petitioner resides or has its principal place of business." For more than thirty years, this court has applied the injury in fact test in determining whether a plaintiff has standing under HRS § 91-7. *See Life of the Land*, 63 Haw. at 171-78, 623 P.2d at 437-442; *Richard*, 82 Hawai'i at 252-55, 921 P.2d at 171-75.

In *Life of the Land*, a non-profit environmental organization and several of its members sought a judicial declaration that the Land Use Commission (LUC) violated state statutory law, as well as state and federal constitutional provisions, in conducting a periodic review of the district boundary classifications of all lands throughout the state of Hawai'i. 63 Haw. at 168-70, 623 P.2d at 436-37; *see also Life of the Land v. Land Use Commission*, 61 Haw. 3, 4, 594 P.2d 1079, 1080 (1979). Life of the Land and its members were neither owners of reclassified land nor owners of land adjoining reclassified land. *Life of the Land*, 63 Haw. at 169, 623 P.2d at 436. The LUC argued that the plaintiffs failed to adequately allege standing because they did not "aver [LUC] actions have resulted in injury to legally-recognized rights or interests which are personally and peculiarly theirs." *Id.* at 171, 623 P.2d at 437-38.

This court observed that the LUC's argument was "reminiscent of a view, formerly espoused, that standing depended upon the presence of a 'legal right, one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.'" *Id.* at 172-73, 623 P.2d at 438 (quoting *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137-38, 59 S.Ct. 366, 83 L.Ed. 543 (1939)). The court explained that this view had been expressly rejected by the United States Supreme Court, which concluded that the relevant inquiry in determining standing

---

2. The instant case was decided on cross-motions for summary judgment. Asato was therefore required to set forth by affidavit or other evidence specific facts demonstrating standing.

to contest a governmental action was whether the plaintiff alleged the challenged action caused injury in fact and whether the interest for which protection was sought lay within the zone of interest protected or regulated by the statute or constitutional guarantee in question. *Life of the Land,* 63 Haw. at 173, 623 P.2d at 438–39 (citing *Ass'n of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153–54, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). The *Life of the Land* court therefore reaffirmed that an injury to aesthetic and environmental interests could be invoked for purposes of demonstrating standing. *Life of the Land,* 63 Haw. at 176, 623 P.2d at 440–41 (citing *Life of the Land,* 61 Haw. at 8, 594 P.2d at 1082).

This court further concluded that the plaintiffs had standing under HRS § 91–7 because they were "endowed with interests that may have been adversely affected." *Life of the Land,* 63 Haw. at 177–78, 623 P.2d at 441. In reaching this conclusion, the court noted that it had concluded in an earlier decision involving the same boundary review, that Life of the Land was a "person aggrieved" for purposes of HRS § 91–14. *Id.* at 175–76, 623 P.2d at 440 (citing *Life of the Land,* 61 Haw. at 6–8, 594 P.2d at 1081–82). In other words, in an earlier case the plaintiffs had alleged both an injury in fact and involvement with or participation in an administrative proceeding. *See Life of the Land,* 61 Haw. at 6–10, 594 P.2d at 1081–83; *Pele Def. Fund,* 77 Hawai'i at 69, 881 P.2d at 1215 (stating that in order to have standing under HRS § 91–14 a plaintiff "must demonstrate that their interests were injured and that they were involved in the administrative proceeding that culminated in the unfavorable decision" (internal quotation marks, brackets, and emphases omitted)).

With regard to alleging an injury in fact, Life of the Land made substantially similar allegations in both cases. Specifically, Life of the Land alleged that individual members of the organization used the land at issue for diving, swimming, hiking, camping, sightseeing, horseback riding, exploring and hunting and for aesthetic, conservational, occupational, professional and academic pursuits, and that future urbanization would destroy beaches and open space enjoyed by the members and decrease agricultural land used for the production of needed food supplies. *Life of the Land,* 63 Haw. at 176 n. 9, 623 P.2d at 440 n. 9. The plaintiffs further alleged that construction would have an adverse effect on its members and on the environment, and that pursuits presently enjoyed would be irrevocably lost. *Id.* Because this court had concluded that Life of the Land had standing in the prior case under HRS § 91–14, it "undoubtedly" had standing under HRS § 91–7. *Id.* at 177–78, 623 P.2d at 441.

In *Richard,* this court considered whether a plaintiff had standing to challenge an administrative rule pursuant to which an insurance company was denying the plaintiff needed surgery. 82 Hawai'i at 250–51, 921 P.2d at 170–71. This court stated that "[w]hen a claimant seeks to do no more than vindicate its own value preferences through the judicial process, and therefore fails to show any actual or threatened injury, that person does not have standing to bring HRS § 91–7 actions in the circuit court." *Id.* at 253, 921 P.2d at 173 (internal quotation marks, brackets, and citations omitted). This court explained that although an additional requirement must be satisfied in order to bring suit under HRS § 91–14 (i.e., involvement with or participation in an administrative proceeding), the "standard rule governing standing to sue applies to actions brought under HRS § 91–7." *Id.* at 254, 921 P.2d at 174.

Thus, until today, it has been well settled that a plaintiff must satisfy the three-part injury in fact test in order to have standing under HRS § 91–7. As this court has recognized, "a court should not 'depart from the doctrine of stare decisis without some compelling justification.'" *State v. Garcia,* 96 Hawai'i 200, 206, 29 P.3d 919, 925 (2001) (quoting *Hilton v. S.C. Pub. Rys. Comm'n,* 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991)). Moreover, considerations of stare decisis "have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and [the legislative branch] remains free to alter what we have done." *Garcia,* 96 Hawai'i at 206, 29 P.3d at 925 (brackets in original) (citing *Hil-*

*ton,* 502 U.S. at 202, 112 S.Ct. 560). Here, this court's decision in *Richard* has stood for more than seventeen years, and the legislature has not amended HRS § 91–7 during that time. Asato has never argued that the rule set forth in *Richard* should be overruled, and there is no compelling justification to do so.

The majority nevertheless abandons this long standing precedent in concluding that "Asato is not required to satisfy the three-part injury in fact test in order to obtain standing" under HRS § 91–7. Majority opinion at 341, 322 P.3d at 236. In support of this position, the majority cites *Life of the Land*'s statement that there has been an "expansive trend in defining injury for standing purposes." Majority opinion at 342, 322 P.3d at 237 (citing *Life of the Land,* 63 Haw. at 175, 623 P.2d at 440). Respectfully, the majority reads this statement out of context.

The expansion noted by the majority was from the formerly espoused view that standing depended on the presence of a particular type of interest (e.g., legal or property interests), to the requirement that the plaintiff need only allege an injury in fact. *Life of the Land,* 63 Haw. at 172–73, 623 P.2d at 438–39. The majority implies that standing under *Life of the Land* is so expansive that the injury in fact requirement no longer applies under HRS § 91–7. However, applying the injury in fact test was itself the expansion to the standing doctrine.

The majority overrules *Richard* because it "seemingly adopted a more stringent standing requirement" than that applied in *Life of the Land.* Majority opinion at 342, 322 P.3d at 237. Specifically, the majority relies on a statement from *Life of the Land* where this court noted that the plaintiffs were "endowed with interests that may have been adversely affected." Majority opinion at 362, 322 P.3d at 257 (citing *Life of the Land,* 63 Haw. at 177–78, 623 P.2d at 441). This statement, however, is not at odds with the application of the injury in fact test.

Under the first prong of the injury in fact test, the plaintiff may allege either an actual or threatened injury. *Mottl,* 95 Hawai'i at 389, 23 P.3d at 724. In *Life of the Land,*

standing was evaluated based on the allegations set forth in the plaintiffs' complaint, because the defendants had filed a motion to dismiss. *See* 63 Haw. at 170, 623 P.2d at 437. Thus, all that was required for the plaintiffs to demonstrate standing in *Life of the Land* were allegations of injury. *See Kahoʻohano-hano v. State,* 114 Hawai'i 302, 318, 162 P.3d 696, 712 (2007) (noting that at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice). As noted above, Life of the Land alleged in its complaint that its members used the land at issue for various recreational, aesthetic, conservational, occupational, professional and academic pursuits, and that future urbanization would destroy beaches and open space enjoyed by the members and decrease agricultural land used for the production of needed food supplies. *Life of the Land,* 63 Haw. at 176 n. 9, 623 P.2d at 440 n. 9. Life of the Land further alleged that construction would have an adverse effect on its members and on the environment, and that pursuits presently enjoyed would be irrevocably lost. *Id.* Given these allegations, it is plain that Life of the Land adequately alleged an injury sufficient to satisfy the injury in fact test. In short, nothing in *Life of the Land* suggests that a plaintiff need not have suffered injury in fact in order to have standing under HRS § 91–7. In my view, therefore, courts should continue to apply the injury in fact test in evaluating standing under HRS § 91–7.

2. **Asato failed to demonstrate that HAR § 3–122–66 caused him to personally suffer either an actual or threatened injury**

As noted above, under the fist prong of the injury in fact test, the plaintiff must allege an actual or threatened injury. *Mottl,* 95 Hawai'i at 389, 23 P.3d at 724. This actual or threatened injury must be a distinct and palpable injury to the plaintiff. *Hanabusa v. Lingle,* 119 Hawai'i 341, 347, 198 P.3d 604, 610 (2008) (citing *Mottl,* 95 Hawai'i at 389, 23 P.3d at 724). The injury must not be abstract, conjectural, or merely hypothetical. *Mottl,* 95 Hawai'i at 389, 23 P.3d at 724.

In his complaint, Asato alleged that "he has been injured and will continue[ ] to be injured by the state and county governments' unlawful use of HAR § 3–122–66 as a perfunctory basis to award contracts for professional services in violation of the 'minimum of three persons' requirement [in] HRS § 103D–304(g)." Specifically, Asato alleged that contracts awarded pursuant to HAR § 3–122–66 violate the public policies sought to be advanced by the legislature in adopting the Procurement Code. In support of these assertions, Asato attached information relating to twenty-six professional services contracts, including what Asato described as "the four ... largest professional services contracts to date for the City and County of Honolulu, all of which [were] for the Honolulu High Capacity Transit corridor, the rail project ... totaling over $144 million." Asato raised similar claims in his motion for summary judgment and in opposition to the Board's cross-motion for summary judgment.

These bare allegations, without more, fail to demonstrate that Asato personally suffered either an actual or threatened injury. Asato repeatedly asserts that HAR § 3–122–66 is at odds with the policy goals of the legislature in adopting the Procurement Code. As this court has recognized, a member of the public may have standing to enforce the rights of the public even though the individual's injury is not different in kind from the public's generally, if that person has suffered an injury in fact. *Pele Def. Fund,* 77 Hawai'i at 70, 881 P.2d at 1216 (citing *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 283, 768 P.2d 1293, 1299 (1989)). Here, however, Asato failed to demonstrate that he personally suffered either an actual or threatened injury because of HAR § 3–122–66. Asato's "sincere, vigorous interest in the action challenged, or in the provisions of law allegedly violated, will not do to establish standing if [his] interest is purely ideological, uncoupled from any injury in fact, or tied only to an undifferentiated injury common to all members of the public." *Capital Legal Found. v. Commodity Credit Corp.,* 711 F.2d 253, 258 (D.C.Cir.1983); *see Akau v. Olohana Corp.,* 65 Haw. 383, 390, 652 P.2d 1130, 1135 (1982) ("Thus a plaintiff has standing if he can demonstrate some injury to a recognized interest such as economic or aesthetic, and is himself among the injured and not merely airing a political or intellectual grievance."). As this court has repeatedly stated, "[w]e abhor the use of courtrooms as political forums to vindicate individual value preferences." *Hawaii's Thousand Friends,* 70 Haw. at 284, 768 P.2d at 1299. "The proper forum for the vindication of a value preference is in the legislature, the executive, or administrative agencies, and not the judiciary." *Id.* at 283, 768 P.2d at 1299.

The majority, having rejected this court's long standing application of the injury in fact test, states that a plaintiff must be "affected" or "involved" with an administrative rule in order to bring suit under HRS § 91–7. Majority opinion at 342–43, 322 P.3d at 237–38. The facts of this case, however, reveal that this purported requirement lacks substance. Asato has made no showing that he was either personally "affected" by or "involved" with HAR § 3–122–66. The majority nevertheless concludes that "as a taxpayer challenging a specific public bidding procedure, he is affected by the validity of a regulation that allegedly allowed an illegal expenditure of public funds." Majority opinion at 343, 322 P.3d at 238. In reaching this conclusion the majority fails to point to any affidavit or other evidence offered by Asato showing that he was personally affected by or involved with HAR § 3–122–66. In effect, the majority holds that a plaintiff satisfies all the requirements of standing under HRS § 91–7 merely by filing suit. Respectfully, HRS § 91–7 does not reflect such an expansive view of standing.

Of course, this court has recognized that the requirements of standing may "be tempered, or even prescribed, by legislative and constitutional declarations of policy." *Mottl,* 95 Hawai'i at 389, 23 P.3d at 724 (quoting *Life of the Land,* 63 Haw. at 172, 623 P.2d at 438). For example, HRS § 92–12(c) provides that "[a]ny person may commence a suit in the circuit court of the circuit in which a prohibited act occurs for the purpose of requiring compliance with or preventing violations of" Hawaii's Sunshine Law. (Emphasis added). The legislature's expansive view of standing under HRS § 92–12(c) is further

evidenced by the fact that "[t]he court may order payment of reasonable attorney's fees and costs to the prevailing party in a suit brought under this section." HRS § 92–12(c).

This court has recognized that the plain language of HRS § 92–12 expressly authorizes "any person" to initiate a lawsuit upon the allegation that a "prohibited act" has occurred in violation of HRS §§ 92–1 through 92–13. *Kaapu v. Aloha Tower Dev. Corp.*, 74 Haw. 365, 381, 846 P.2d 882, 889 (1993); *see also Right to Know Comm. v. City Council, City & County of Honolulu*, 117 Hawai'i 1, 10, 175 P.3d 111, 120 (App. 2007). In effect, HRS § 92–12 gives any person standing to initiate a lawsuit as a "private attorney general" inasmuch as he or she is a "person upon whom the legislature has conferred the right to seek judicial review of agency action." *Kaapu*, 74 Haw. at 380–81, 846 P.2d at 889 (internal quotation marks, brackets, and citation omitted). The injury in fact test therefore does not apply to suits brought pursuant to HRS § 92–12. *Richard*, 82 Hawai'i at 254, 921 P.2d at 174.

In contrast, HRS § 91–7 does not allow "any person" to file suit. Instead, HRS § 91–7 provides that only an "interested person" may obtain a judicial declaration as to the validity of an agency rule. The legislature could have extended standing to challenge agency rules to any person, but it has not done so. *See, e.g., Kellas v. Dep't of Corr.*, 341 Or. 471, 145 P.3d 139, 142 (2006) (interpreting state statute which provides that the "validity of any rule may be determined upon a petition by any person to the Court of Appeals" (emphasis added)). In the absence of such explicit language from the legislature, this court has no reason to depart from the well established injury in fact test. *Richard*, 82 Hawai'i at 254, 921 P.2d at 174.

Finally, the majority notes that in adopting HRS § 91–7, the legislature departed from the Model State Administrative Procedure Act of 1961, § 7 (superceded 1981) (MSAPA). Majority opinion at 343–44, 322 P.3d at 238–39. Under the 1961 MSAPA, the validity of a rule could be determined in an action for declaratory judgment if it was "alleged that the rule, or its threatened application, inter-

feres with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff." *Id.* In removing this language, the House Judiciary Committee stated that HRS § 91–7 "will allow an interested person to seek judicial review on the validity of a rule for the reasons enumerated [in HRS § 91–7(b) ] regardless of whether there is an actual case or controversy." H. Stand. Comm. Rep. 8, 1961 House Journal, at 658. Relying on this language, the majority concludes that "the legislature obviously intended to liberalize standing requirements." Majority opinion at 32739588.

Respectfully, this passage cannot support the conclusion that the legislature intended to afford standing to anyone who brings suit, irrespective of whether he or she has shown an injury in fact. To begin with, as noted above, the plain language of the statute does not support such an interpretation, since it refers to suit being brought by an "interested person" rather than "any person." *See Keliipuleole v. Wilson*, 85 Hawai'i 217, 221, 941 P.2d 300, 304 ("Courts are bound to give effect to all parts of a statute, and ... no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." (internal quotation marks and brackets omitted)).

Moreover, it is important to consider how the legislature deviated from the MSAPA when it adopted the Hawai'i Administrative Procedure Act in 1961. Specifically, the legislature deleted the requirement that the challenged rule must interfere with or impair the "legal rights or privileges of the plaintiff." As this court explained in *Life of the Land*, formulations of standing that are dependent on "legally recognized interests" are "[i]n some respects ... reminiscent of a view, formerly espoused, that standing depended upon the presence of a 'legal right, one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.'" 63 Haw. at 172–73, 623 P.2d at 438 (citation omitted). We expressly rejected that restrictive view of standing, and instead

held that plaintiffs who seek to bring suit under HRS § 91–7 only need to allege that they have suffered an injury in fact. *Id.* at 173–77, 623 P.2d at 439–41. That holding was completely consistent with the intention of the legislature in rejecting the "legal rights or privileges" language in the MSAPA, and there is no reason to abandon it now.

## C. Asato failed to demonstrate taxpayer standing

In *Iuli*, 62 Haw. at 184, 613 P.2d at 656, this court set forth "specific requirements which must be met before standing to taxpayers [may be] granted." In order to satisfy the requirements of taxpayer standing: (1) the act complained of must be more than "mere irregularity," and "[i]n addition to an illegal act, the act must be such as to imperil the public interest or work public injury"; (2) the plaintiff must allege "loss in revenues resulting in an increase in plaintiff's tax burdens or to taxpayers in general"; and (3) in the absence of a statute governing such suits, the plaintiff must demand upon the proper public officer to take appropriate action, unless the facts alleged sufficiently show that demand to bring suit would be useless.[3] *Id.*, 62 Haw. at 184, 613 P.2d at 656.

Asato failed to satisfy the second element of this test, i.e., he failed to demonstrate that HAR § 3–122–66 has increased his personal tax burden or the burden on taxpayers generally. To the extent Asato alleged that the City and County of Honolulu has awarded at least twenty six professional services contracts pursuant to HAR § 3–122–66, he offered no evidence that those contracts increased either his personal tax burden or the burden of taxpayers generally. And, nothing in the record suggests that those contracts in fact increased the burden on taxpayers generally.

In *Iuli*, this court also noted two "special situations" in which damage to a taxpayer

may be presumed. *Id.* at 185–186, 613 P.2d at 657. Specifically, the *Iuli* court noted *Bulgo v. County of Maui*, 50 Haw. 51, 54–56, 430 P.2d 321, 324–25 (1967), in which this court held that a taxpayer had standing to challenge the constitutionality of a special election, and *Federal Electric*, 56 Haw. at 64–65, 527 P.2d at 1290, in which this court concluded that a disappointed bidder had standing as a taxpayer to challenge a contract awarded to a higher bidder. Citing *Federal Electric*, Asato argues that damage may be presumed based on the allegations in his complaint.

In *Federal Electric*, this court was confronted with a "unique" situation in which the City's "conventional bidding method was not employed, and an innovative procedure without benefit of definitive guidelines was instead utilized" in seeking to upgrade the police department's communication system. 56 Haw. at 66, 527 P.2d at 1291. As a result of this innovative procedure, the City awarded the communication system contract to the higher bidder, whose bid exceeded that of Federal Electric by more than $90,000. *Id.* at 59, 527 P.2d at 1287.

No analogous circumstances are presented in this case. Asato seeks to challenge HAR § 3–122–66, which is not an "innovative procedure without benefit of definitive guidelines." *Id.* at 66, 527 P.2d at 1291. The rule at issue here was promulgated in 1995, and provides detailed guidance to agency heads who are confronted with a narrow situation not expressly addressed in HRS § 103D–304(g) (i.e., when fewer than three qualified persons have been identified to be considered for a professional services contract). Moreover, on the facts of *Federal Electric*, it is apparent why damage to taxpayers could be presumed in that case. Specifically, the bidding procedure employed by the City in that case resulted in the higher of two submitted bids being accepted by the City. *See Fed.*

---

**3.** This court articulated a slightly different test in *Hawaii's Thousand Friends*, 70 Haw. at 282, 768 P.2d at 1298, applicable when a taxpayer seeks to challenge illegal expenditures by a public agency. In *Hawaii's Thousand Friends*, this court stated that, under those circumstances, two requirements must be met for taxpayer standing: (1) the plaintiff must be a taxpayer who contributes to the particular fund from which illegal expenditures are made; and (2) plaintiff must suffer a pecuniary loss, which, in cases of fraud, are presumed. *Id.* Here, Asato failed to demonstrate standing under this test as well because he has not shown a pecuniary loss, nor has he alleged fraud.

*Elec. Corp.,* 56 Haw. at 59, 527 P.2d at 1287. Asato has failed to demonstrate or even allege that any similar circumstances are present here.

*Federal Electric* is further distinguishable because that case was decided at a time when there was no express provision allowing for a judicial action by disappointed bidders. Compare HRS chapter 103 (1968) with HRS § 103D–710 (2012). The current procurement code, however, explicitly provides for judicial review of a disappointed bidder's claim following administrative review. *See* HRS § 103D–710. In most instances, the persons involved in the procurement process will be best positioned to enforce the provisions of the Procurement Code and can do so through the process the Procurement Code sets out. Asato therefore failed to demonstrate taxpayer standing.

## D. Asato failed to demonstrate standing under HRS § 632–1

In his complaint, Asato also asserted that this was an action for declaratory relief under HRS § 632–1. Section 632–1 provides:

In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for; provided that declaratory relief may not be obtained in any district court, or in any controversy with respect to taxes, or in any case where a divorce or annulment of marriage is sought. Controversies involving the interpretation of deeds, wills, other instruments of writing, statutes, municipal ordinances, and other governmental regulations, may be so determined, and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.

Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding. Where, however, a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed; but the mere fact that an actual or threatened controversy is susceptible of relief through a general common law remedy, a remedy equitable in nature, or an extraordinary legal remedy, whether such remedy is recognized or regulated by statute or not, shall not debar a party from the privilege of obtaining a declaratory judgment in any case where the other essentials to such relief are present.

HRS § 632–1.

This court has not considered whether a declaratory action may be brought under this section to challenge the validity of an agency rule. *See Costa v. Sunn,* 5 Haw.App. 419, 424 n. 9, 697 P.2d 43, 47 n. 9 (1985) ("Query whether a declaratory action regarding the validity of an agency's regulations may be brought under either HRS §§ 91–7 or 632–1."). Assuming arguendo that such an action could be brought, Asato nevertheless failed to demonstrate standing under this section as well.

As the court explained in *Bremner v. City & County of Honolulu,* 96 Hawai'i 134, 143, 28 P.3d 350, 359 (App.2001), although HRS chapter 632 is to be "liberally interpreted and administered, with a view to making the courts more serviceable to the people," HRS § 632–6, "nowhere does the law suggest that this admonition trumps the standing requirement of a 'personal stake' or an 'injury in fact.'" Indeed, the "specific harm which our standing doctrine requires ... by no means interposes an excessive burden upon plaintiffs who seek the services of the courts." *Id.*

at 143, 28 P.3d at 359. "Rather, the requirement ensures that judicial intervention will be within the particular capabilities of the courts, and not be constitutional folly." *Id.* (citing *Life of the Land,* 63 Haw. at 171–72, 623 P.2d at 438). For the reasons set forth above, Asato failed to demonstrate such a personal stake as to warrant his invocation of the court's jurisdiction and to justify the exercise of the court's remedial powers on his behalf. *Life of the Land,* 63 Haw. at 172, 623 P.2d at 438.

For the foregoing reasons, in my view the majority's position unnecessarily abandons long established precedent applying the injury in fact test to suits brought under § 91–7. Asato has failed to carry his burden of demonstrating standing under HRS § 91–7, taxpayer standing, and HRS § 632–1. Accordingly, I respectfully dissent.